## In the District Court of the United States
## For the District of South Carolina
### BEAUFORT DIVISION

| | | |
|---|---|---|
| Uuno Mattias Baum, #272249, | ) | Civil Action No.  9:06-2471-MBS-GCK |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Collie Rushton, Warden, McCormick | ) | **OF THE MAGISTRATE JUDGE** |
| Correctional Institution, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

### I.    INTRODUCTION

The Petitioner, Uuno Mattias Baum ("Petitioner" or "Baum"), a state prisoner represented by counsel, seeks *habeas corpus* relief under Title 28, United States Code Section 2254.  By definition, the relief which he seeks must be based upon a finding that he is being illegally detained in violation of the Constitution or laws or treaties of the United States.  28 U.S.C. § 2241(c)(3).  This case was automatically referred to the undersigned United States Magistrate Judge for all pretrial proceedings pursuant to the provisions of Title 28, United States Code, Sections 636(b)(1)(A) and (B), and Local Civil Rules 73.02(B)(2)(c), D.S.C.

This *habeas* case raises the issue of whether the Double Jeopardy Clause barred retrial of the Petitioner for murder, where the trial court, at the original trial, held that the discovery of the victim's body after the trial had begun constituted "manifest necessity" which justified a mistrial.  Both the Respondent and the Petitioner have filed motions for summary judgment. As these are dispositive motions, this Report and Recommendation is entered for review by the District Court.  For the reasons discussed below, it is respectfully recommended that Petitioner's Petition for *habeas corpus*, and motion for summary judgment be denied, and that the Respondent be granted summary judgment.

## II.    PROCEDURAL HISTORY IN STATE COURT

### A.  Proceedings in the Court of General Sessions

On November 11, 1999 the Pickens County Grand Jury returned a indictment which charged Petitioner with the murder of his step-father, Randall Pinion, on or about October 29, 1999 in Easley, South Carolina.[1]  (Tab #1, pp. 290-291).  Although the state had not recovered the body of the victim, Randall Pinion, Petitioner's trial commenced on October 9, 2000 before the Honorable John W. Kittredge.  (Tab #1, pp. 12-242)  Petitioner was represented by John W. DeJong, Esquire.  The State was represented by Assistant Solicitors Ralph L. Gleaton, Esquire and A. Lance Crick, Esquire.  After the parties selected a jury, Judge Kittredge administered the oath to the jurors sometime after 3:41 p.m. on October 9, 2000.  (Tab #1, p.112).  In his opening statement, the Solicitor told the jury that the state had not recovered the body of the victim, but, nevertheless, it was proceeding with the trial.  (Tab #1, p. 121).  The jury heard the testimony of three witnesses that day:  Edie Pinion (the Petitioner's mother and the wife of the victim); Steven Steward, and William Rutledge.  (Tab #1, pp. 129-192).

On the morning of the second day of trial (October 10, 2000), the Solicitor informed Judge Kittredge that a decomposed body had been found in North Carolina which had been identified as Baum's missing step-father.  The Solicitor also submitted an affidavit from a dentist that the dental records matched those of the victim.  (Tab #1, p. 202).  The Solicitor said:

> Your Honor, based on finding the body, at this time, I feel that I have to move for either a continuance or a mistrial in order to give both sides of this case time to look at what evidence may come forward as a result of this.
>
> Obviously, there may be–we don't know what's going to show up, but there may be evidence exculpating the defendant.  And if that's true, he needs to have access to that.  Conversely, there may be evidence that inculpates him and shows that he, in fact, is the one who dumped

---

[1]    All references to Tab numbers are to the tabbed pages bound together by the Respondent and identified as "Attachments to Return".

the body.  And it that's the case, he should not be allowed to benefit from his attempt at
obstructing justice.

Either way, Your Honor, I am aware that the jury has been sworn.  I would ask that Your
Honor, if you are inclined to grant my motion, find that this is for good cause and not as a result
of some wrongdoing or anything else in that way of the State, and therefore would not
prejudice us by attaching jeopardy to a trial that we've begun.

Your Honor knows that we are here and are prepared to go forward, and it's not any attempt
whatsoever to continue this trial.  As a matter of fact, I believe myself and family who are here
behind me are as ready as the defendant himself to get this behind us.  But this is important
evidence that we need to have some time to look at.  (Tab #1, p. 5, lines 7-24– p. 6, lines 1-5)

In response, Baum's attorney, Mr. DeJong, said:

May it please the Court, Your Honor.  Just for the record, that is certainly the State's motion.
The defense is not joining in that motion in any way, shape, form or fashion.  We are here.
We're ready for trial.  And we're ready to proceed, Your Honor.  (Tab #1, p. 6, lines 8-12).

Judge Kittredge then said:

I'm going to declare a mistrial.  I have received an affidavit from the dentist.  Based on
his review of the situation and a conference with the medical examiner for the State of North
Carolina, based on the level of certainty that this may, indeed, be the remains of Mr. Pinion,
that a mistrial is warranted for good cause, not the result of anything caused or done, any act
or omission by the state.  I feel that this is a matter of manifest necessity and that jeopardy will
continue.  Jeopardy does not attach and begin anew in my firm judgment, and I so rule that this
is a matter of manifest necessity that potentially could enure to the benefit of the defendant.  A
key issue in the case was the fact that the body had not been found.  This revelation is
significant.  And if it actually turns out, based on the scientific examination, that this is indeed
the remains of Mr. Pinion, then this case should well not continue and be retried at another
date.  Again, I note jeopardy will continue, and that's my ruling in the case.  (Tab #1, p. 6, lines
14-25–p. 7, lines 1-8).

On November 2, 2000, the Honorable Henry F. Floyd presided over a bond hearing

for Petitioner.  Judge Floyd stated that he had contacted Judge Kittredge regarding the matter,

and that Judge Kittredge would file an order stating his reasons for granting a mistrial.  (Bond

Hearing p. 10)  On November 8, 2000, a month after Petitioner's initial trial, Judge Kittredge

filed an order which stated in pertinent part:

Based upon everything presented to this court, I hereby find that the discovery of the victim's
body almost one year after the date of the alleged murder was in no way a result of any act,
omission, negligence, bad faith, or lack of effort on the part of the State.  The State has
diligently attempted to locate the deceased but had simply been unable to do so.  In this
regard, it is reasonable to conclude that whomever placed the body of Randall Pinion in the

remote are of McDowell County [North Carolina] did so to secrete the whereabouts of the deceased and avoid detection.  Furthermore, given the fact that the defendant [has been] incarcerated since November 7, 1999, unable to make bond, it was imperative upon the State to proceed to trial without further delay.  In fact, there was an order requiring the case to proceed to trial.

I specifically find that it is of manifest necessity that a mistrial be granted in this case.  The potential for exculpatory evidence being located with the body and the disposition site is significant and could potentially benefit or even exonerate the defendant.  This Court is aware of the concerns regarding a mistrial in any case and makes its decision after careful review of all the circumstances and the possible alternatives to granting a mistrial.

The court is aware of the decision in *Gilliam v. Foster*, 75 F.3d 881, and specifically finds that there was no other alternative available to the court to resolve this matter.  It is imperative that the jury charged with deciding this case be given any and all relevant evidence upon which to base their decision.  *See also Foster v. Gilliam*, 515 U.S. 1301 (1995).  To ignore the opportunity to explore the disposition of the body, which could very likely be exculpatory to the defense, is too great.  As stated in *State v. Prince*, 279 S.C. 30, 301 S.E.2d 471 (1983), the standard for declaring a mistrial depends upon the existence of "manifest necessity or the ends of public justice, the latter being defined as the public's interest in a fair trial designated to end in just judgment."  *Id.* at 472.  *See also Illinois v. Somerville*, 410 U.S. 458 (1973); *State v. Gamble*, 275 S.C. 492, 272 S.E.2d 796 (1980); and *State v. Kirby*, 269 S.C. 25, 236 S.E.2d 33 (1977).  Furthermore, to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned (especially Defendant and the jurors) and contrary to the ends of justice.

Having found the existence of manifest necessity for the mistrial, jeopardy continues in this case and the State is not prohibited from retrying this case at a later time.[2]  (Tab #1, pp. 9-10).

_____

[2]     As a collateral issue in the habeas case, Petitioner contends that Judge Kittredge lacked authority to enter this Order.  Petitioner argues that according to Court Administration, Judge Kittredge was assigned to Pickens County for a one-week term of court for General Sessions on October 9, 2000, and, therefore, Judge Kittredge's Order, signed on November 8, 2000, was entered after Judge Kittredge's term had expired and is ultra vires. (Petition [1] at p. 5, n.4).

As the Respondent correctly points out, Judge Kittredge's Order was entered in reference to a matter the judge actually ruled upon during trial.  *See* Respondent's Return and Memorandum of Law [10] at p. 13, n.5.  Therefore, the judge retained the authority to enter the order.  *See State v. Best*, 257 S.C. 361, 186 S.E.2d 272, 269-70 (1972)(acknowledging that circuit judges retain authority to enter orders on motions actually heard during a term of court in another circuit even though the judge has since left the circuit).

Significantly, the Petitioner appears to have conceded by Brief that Judge Kittredge's Order merely reduced to writing his thoughts and ruling stated during the October 10, 2000 hearing.  *See* Petitioner's Motion for Summary Judgment and Opposition to the State's Motion for Summary Judgment [17] at p. 14 (" . . . Judge Kittredge filed an order expressing his rationale for granting the mistrial")). Importantly, Judge Kittredge did not

The case was called for trial before Judge Floyd and a jury on January 22-24, 2001. At the beginning of that trial, Baum's attorney, Mr. DeJong, moved for an order barring the trial "under the Fifth Amendment of the United States Constitution applied to the states through the Fourteenth Amendment, obviously that being double jeopardy." (Tab #1, p. 14, lines 20–p. 15, line 1). Mr. DeJong argued that jeopardy attached in a criminal case when the jury was sworn, relying on the Fourth Circuit's *en banc* decision in *Gilliam v. Foster,* 75 F.3d 881 (4th Cir. ).[3] Furthermore, DeJong argued that the State essentially had taken a chance by electing to go to trial even though the body had not been found. Judge Floyd stated:

> I can't grant you the relief simply because under the existing case law of this state the previous trial judge has tied my hands and I have no authority to override his order. . . .That can only be done by an appellate court and I think we're going to spend two or three days here doings something that's not, you know, not going anywhere, but I don't have the authority to do that. (Tab #1, p. 28)

On January 24, 2001, the jury found Baum guilty of the murder of his step-father, and Judge Floyd sentenced Baum to life in prison. (Tab #1, p. 289, lines 1-5).

---

revise or modify his ruling after his term of court ended. This is no more than a ruling from the bench that is later reduced to writing for purposes of appeal. No new matter or issue was raised or addressed by the Order. Moreover, the undersigned notes that the time for litigation of this issue has long since passed. Neither party objected to the Order and the Order was presented, and relied upon, in the direct appeal. In addition, although Petitioner has repeatedly questioned jurisdiction, the matter of jurisdiction is clearly a state law issue and should have been raised in state court prior to this Petition. *Wright v. Angelone*, 151 F.3d 151, 158 (4th Cir. 1998).

Finally, while not argued by the Respondent, it appears that this issue has been raised in state court by Petitioner's Issue Two, set forth in his initial PCR action, *see infra* at ___, and again in Petitioner's Ground One, set forth in his Amended PCR action, *see infra* at ___. The undersigned acknowledges and replies upon Petitioner's concession on page 14 of his Motion for Summary Judgment and Opposition to the State's Motion for Summary Judgment [17] that Judge Kittredge's Order merely reduced to writing his thoughts and ruling stated during the October 10, 2000 hearing. To be sure, if this court were to discount Petitioner's concession, and instead address whether this claim is properly before the court in this habeas Petition, the court would be compelled to recommend dismissal of the entire habeas action, as this claim could be considered unexhausted. Of course, the court cannot adjudicate "mixed" habeas petitions which contain both exhausted and unexhausted claims. *See Rose v. Lundy*, 455 U.S. 509, 522, 102 S.Ct. 1198, 71 L.Ed.2d 379 (1982).

[3]    In *Gilliam*, the court held that the Fifth Amendment encompasses a right to have a particular tribunal decide guilt or innocence once jeopardy has attached.

Petitioner filed a timely notice of intent to appeal. Joseph L. Savitz, III, Deputy Chief

Attorney of the South Carolina Office of Appellate Defense, represented Petitioner on appeal.

Appellate counsel filed a Final Brief of Appellant with the South Carolina Court of Appeals

on July 23, 2002, and raised the following issue:

> Since the mere discovery of the victim's remains did not constitute manifest necessity for a
> mistrial, the Double Jeopardy Clause barred appellant's retrial and conviction. (Final Brief of
> Appellant, p. 3).

The Court of Appeals affirmed the conviction in *State v. Baum*, 355 S.C. 209, 584

S.E.2d 419 (S.C. Ct. App. 2003). The South Carolina Court of Appeals began its analysis by

discussing the Double Jeopardy clause, noting that "a defendant is protected from (1)

prosecution for the same offense after acquittal, (2) prosecution for the same offense after

conviction, and (3) multiple prosecution [sic] for the same offense after an improvidently

granted mistrial." *State v. Baum*, 355 S.C. at 214, 584 S.E.2d at 421. The *Baum* court stated:

> Generally, jeopardy attaches when the jury is sworn and impaneled, unless the defendant
> consents to the jury's discharge before it reaches a verdict or legal necessity mandates the
> jury's discharge. *Baum*, 355 S.C. at 214, 584 S.E.2d at 422 (citation omitted).
>
> Unlike the situation in which the trial has ended in an acquittal or conviction, retrial is not
> automatically barred when a criminal proceeding is terminated without finally resolving the
> merits of the charges against the accused. Because of the variety of circumstances that may
> make it necessary to discharge a jury before a trial is concluded, and because those
> circumstances do not invariably create unfairness to the accused, his valued right to have the
> trial concluded by a particular tribunal is sometimes subordinate to the public interest in
> affording the prosecutor one full and fair opportunity to present his evidence to an impartial
> jury. *Arizona v. Washington*, 434 U.S. 497, 505, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). The
> test to determine whether sound grounds exist for declaring a mistrial after the jury is sworn is
> "whether the mistrial was dictated by manifest necessity or the ends of public justice, the latter
> being defined as the public's interest in a fair trial designated to end in just judgment." *State v.
> Prince*, 279 S.C. 30, 33, 301 S.E.2d 471, 472 (1983).
>
> "Manifest necessity" is not a standard that can be applied mechanically or without attention to
> the particular problem confronting the trial judge. Further, the word "necessity" is not to be
> interpreted literally. *Arizona*, 434 U.S. at 505-06, 98 S.Ct. 824. Rather, there need only be a
> "high degree" of necessity in order to conclude that a mistrial is appropriate under the
> circumstances. *Id.* at 506, 98 S.Ct. 824. Whether a mistrial is mandated by manifest necessity
> is a fact specific inquiry. *Rowlands*, 343 S.C. at 457, 539 S.E.2d at 719. Given the "varying
> and often unique situations arising during the course of a criminal trial," the United States
> Supreme Court has recognized a broad discretion reserved to a trial judge in declaring a

mistrial.  *Kirby*, 269 S.C. at 29, 236 S.E.2d at 35 (*quoting Illinois v. Somerville*, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973)).  A trial judge's decision to grant a mistrial will not be overturned absent an abuse of discretion amounting to an error of law.  *Rowlands*, 343 S.C. at 458, 539 S.E.2d at 719.

Applying this test, the state appellate court affirmed Petitioner's conviction, holding the Double Jeopardy Clause did not bar the second trial.  The South Carolina Court of Appeals concluded that it could not "say that the body of the victim in this case was critical evidence in the prosecution of Baum such that its unavailability triggers the strict scrutiny announced in *Arizona* [*v. Washington*, 434 U.S 497 (1978)]."  *State v. Baum*, 355 S.C. at 215, 584 S.E.2d at 422.  The court reasoned as follows:

> [T]he discovery of the body of a victim during a murder trial[] is an extremely important piece of evidence which has just as much potential to exonerate as to inculpate an accused.  The judge recognized as much, and found that the public's interest in a fair adjudication was implicated by the possibility of discovering exculpatory evidence and giving the jury the benefit of the fully developed facts when deciding the matter.  Consequently, we believe manifest necessity was clearly established, and find no abuse of discretion in the trial judge's determination that a mistrial was dictated by such.  *Id.*

Appellate counsel filed a Petition for Rehearing on June 26, 2003.  (App. pp. 7-8).  The Court of Appeals denied the petition on August 22, 2003.  (App. p. 11).  Thereafter, Appellate counsel filed a Petition for Writ of Certiorari in the Supreme Court of South Carolina on December 17, 2003, and raised the following issue:

> Since the mere discovery of the victim's remains did not constitute manifest necessity for a mistrial, the Court of Appeals erred in holding that the Double Jeopardy Clause did not bar petitioner's retrial and conviction.  (Petition for Writ of Certiorari, p. 2).

The State filed its return on February 17, 2004.  The Supreme Court of South Carolina denied the petition on October 21, 2004.  The South Carolina Court of Appeals issued the remittitur on October 26, 2004.

Next, Petitioner sought review in the United States Supreme Court, and on January 13, 2005, filed a Petition for Writ of Certiorari in the United States Supreme Court which raised the following issue:

> Did the mere discovery of the murder victim's remains during Baum's trial constitute manifest necessity for a mistrial, so that the Double Jeopardy Clause of the Fifth Amendment to the United States Constitution did not bar his subsequent retrial?  (Tab 10, p. 1).

The Respondent filed a brief in opposition on April 13, 2005.  (Tab 11).  The United States Supreme Court denied the petition on May 16, 2005.  (Tab 12).

On October 11, 2005, Petitioner filed a *pro se* application for post-conviction relief ("PCR"), in which he raised the following claims:

> 9(a) Ineffective Assistance of counsel at trial;

> 9(b) Ineffective Assistance of Appellate Counsel;

> 9(c) Ineffective Assistance of Appellate Counsel.  (Tab 13, p. 3).

Petitioner also filed a Brief in Support of PCR and Memorandum of Law (Tab 14), which set out the following issues:

> First Issue:  Trial counsel was ineffective when he failed to file appeal of trial courts order declaring mistrial where trial court's order articulated Jeopardy would not attach thereby denying Applicant's double Jeopardy claim.

> Issue Two:  Trial counsel was ineffective when he failed to object that first trial Judge Honorable John W. Kittredge had no jurisdiction to issue a written order in support of his declaration of mistrial twenty-nine (29) days after the fact and where he made no mention of such an order in the trial record.

> Issue Three:  Trial counsel was ineffective by failing to object to the introduction of irrelevant evidence by the state which had no factual significance to the crime for which Applicant was charged.  Trial counsel failed to object to the introduction of a set of golf clubs, this evidence was irrelevant pursuant to Rule 403 S.C. rules of evidence, and undully [sic] prejudicial to Applicant.

> Issue Four:  Trial counsel provided ineffective assistance when he failed to present evidence or show through cross examination of state witnesses that the body of the alleged victim did not contain bullet wounds, actual bullets or injuries from the impact of bullets, or any evidence of a stabbing in order to allow applicant the ability to cast doubt on the alleged statement made by Juanita Trueblood.

> Issue Five:  Trial counsel was ineffective when he failed to act and function as advocate for defense, instead of acting as Applicant's diligent consceintous [sic] advocate, trial counsel acted an advocate for the prosecution by failing to conduct a basic factual and legal investigation to determine a proper defense.

Issue Six:  Trial counsel was ineffective by failing to move for speedy trial after Applicant expressed his desire to exercise his ...constitutional right to a speedy trial.

Issue Seven:  Trial counsel was ineffective when he failed to present expert witness Don Girdnt who was hired by the defense and present at trial.  In re: to states evidence involving Applicant's tennis shoes.

Issue Eight:  Trial counsel was ineffective when he failed to object to Solicitor's comments on a "crack pipe" found in Randall Pinion's home, and that this might have been the motive for the alleged forgery when no nexus was ever established between the "crack pipe" and Applicant.  (Tab 14)

On December 5, 2005, Petitioner filed an amendment to the application and raised the following issues:

[Issue One](A)  Applicant claims trial counsel was ineffective when he failed to object that Applicant's first trial judge, the Honorable John W. Kittredge, had no jurisdiction to issue a post-hoc order, in which he makes a factual finding to support his ruling on the manifest necessity of mistrial, twenty-nine (29) days after the mistrial was declared. Because the term of General Sessions Court had ended, Judge Kittredge, who sat as circuit judge during the term, no longer had jurisdiction to act on the case pursuant to South Carolina Code of Laws, Title Code 14-5-390.  "Circuit Judge, while sitting in one circuit, has no jurisdiction to hear or determine application for judgement . . . in case pending in another circuit." *McEachern v. Poston*, 254 S.E.2d 796.

[Issue One](B)  Trial Counsel was ineffective when he failed to object that this factual finding was made only after the Honorable Judge Henry F. Floyd, while conducting a motion hearing in defendant/applicant's case during a subsequent term of court, contacted Judge Kittredge making him aware of the error concerning Judge Kittredge's mistrial ruling during applicant's first trial and instructed Judge Kittredge that he must issue this erroneous order to correct the problem concerning double jeopardy. Judge Floyd, advocated a correction on a <u>crucial</u> omission from the record by Trial Judge Kittredge.  Rather than ruling on the record  as it existed Judge Floyd acted improperly, and trial counsel was ineffective by failing to object to this conduct.

Second Issue  Trial counsel provided ineffective assistance when he failed to move for dismissal of indictment on the grounds that there was no evidence to support a finding by the grand jury in returning an indictment for murder.  In light of the fact that no evidence existed to support the finding, trial counsel was ineffective by failing to ensure that a lawful grand jury proceeding actually took place and that there was evidence presented to support such a finding.  The grand jury returned a true bill indictment on November 11, 1999, which was (12) days after the alleged victim was reported missing on October 30, 1999; after the return of the true bill, applicant is entitled to review the grand jury proceeding pursuant to *Evans v. State*, 611 S.E.2d 510 to determine if the evidence presented was sufficient to support the finding.

Third Issue   Trial counsel provided ineffective assistance at applicant's first trial when he failed to request an opportunity to be heard prior to the trial courts declaration of mistrial, in order to suggest that trial court consider other less drastic alternatives before declaring a mistrial.  "If <u>alternatives</u> existed, then society's interest in fair trials designed to end in just judgements was not in conflict with <u>defendant's right</u> to have cause submitted to the jury."  *U.S. v. Shafer*, 987 F.2d 1054 (4th Cir. 1993) [emphasis provided by Petitioner].

Fourth Issue   Trial counsel in direct opposition to applicant's wishes absolutely refused to put forth any defense at all and as a result trial counsel was ineffective.  Trial counsel refused to present any type defense and advised applicant that if he testified in his own defense, "the jury would convict" on the basis of his prior record and by allowing applicant to testify, defense counsel would lose last argument to the jury.

Fifth Issue   Applicant claims his trial counsel rendered ineffective assistance where trial counsel failed to file a motion for a bill of particulars.  The Sixth Amendment of the United States Constitution states that "every criminal defendant shall be informed of the nature and cause of the accusation against him."  It is well settled that indictment must reasonably inform the defendant of what he must be prepared to defend.  Applicant's indictment of murder failed to set forth how applicant allegedly killed victim, while although sufficient, applicant states his trial counsel should have, prior to trial, moved for a bill of particulars to apprise the defense of the state's theory of how the applicant supposedly killed the victim.  Applicant asserts his trial counsel's omission prejudiced the defense, because had his trial counsel obtained a bill of particulars the applicant would have had ample opportunity to rebut the state's theory of what allegedly happened.  In effect, casting sufficient doubt to undermine any possibility of applicant's guilt of murder.

Caroline M. W. Horlbeck, Esquire, was appointed to represent Petitioner.  On July 27, 2006, Petitioner moved to have Ms. Horlbeck relieved of appointment and have Thomas J. Thompson, Esquire, appointed counsel of record.  The Honorable G. Edward Welmaker, Chief Administrative Judge for the Thirteenth Judicial Circuit, granted Petitioner's motion to substitute counsel.  (Tab #16).  On August 21, 2006, PCR counsel moved for a continuance.  Judge Welmaker granted the motion and continued the case until December 2006.  (Tab #17).  The Respondents have informed the court that the case was heard the week of December 11, 2006, and is presently under advisement.

The court has reviewed the following records:

(1) Record on Appeal;

(2) Supplemental Record on Appeal;

(3) Final Brief of Appellant;

(4) Final Brief of Respondent;

(5) Appendix;

(6) Petition for Writ of Certiorari;

(7) Return to Petition for Writ of Certiorari;

(8) October 21, 2004 Order (denying petition);

(9) October 26, 2004 Remittitur;

(10) Petition for Writ of Certiorari (United States Supreme Court);

(11) Brief in Opposition (United States Supreme Court);

(12) May 16, 2005 Letter (advising counsel the United States Supreme Court denied the

petition for review on May 16, 2005;

(13) Application for Post-Conviction Relief;

(14) Attachment to Application for Post-Conviction Relief (Brief in Support of PCR Application);

(15) Amendment to Application for Post-Conviction Relief;

(16) Order Substituting Counsel;

(17) Order of Continuance.

## IV.  FEDERAL COURT HISTORY

### A.  Petitioner's Petition for a Writ of Habeas Corpus

Petitioner was confined to the McCormick Correctional Institution ("McCormick CI")
at the time he filed his Petition for a writ of habeas corpus (the "Petition") on September 16,
2006 against Collie Rushton, Warden of McCormick CI (the "Respondent").[4]  [1]

On September 27, 2006, the undersigned issued an Order which authorized service on
the Respondent and notified Petitioner of the change of address rule.  [5]  Thereafter, counsel

---

[4]        Petitioner was transferred to Lee Correctional Institution after he filed his Petition.  *See*
Petitioner's Return [11] at p. 1, n.1.

for the Respondent requested an extension of time in which to file a response [8], which the undersigned granted on November 16, 2006 [9].  On December 15, 2006, the Respondent filed a Motion for Summary Judgment [11] and a Return and Memorandum of Law in Support of Motion for Summary Judgment (the "Return").  [10-1---10-19]

On December 15, 2006, the undersigned issued an Order pursuant to *Roseboro v. Garrison*, 528 F.2d 309 (4th Cir. 1975), notifying Baum of the summary judgment dismissal procedure and the possible consequences if he failed to respond adequately to the Motion for Summary Judgment.  [12]  On December 18, 2006, counsel for Baum filed a motion for an extension of time [13], which was granted by an oral order [14].  On January 25, 2007, counsel for Baum filed a response to the Respondent's motion for summary judgment [15], and on February 5, 2007, the Respondent filed his Reply [16].  Thus, the case is ripe for review.

### B.  Exhaustion of State Court Remedies

Although Petitioner's state PCR action is still pending, the sole issue presented in this action has been exhausted by way of his direct appeal, and cannot be raised again, and as Respondent concedes, is properly exhausted.[5]

### C.  Application of the Antiterrorism and Effective Death Penalty Act of 1996

Because Baum filed his Petition on September 6, 2006, the provisions of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA") apply to this case.  *Lindh v. Murphy*, 521 U.S. 320, 117 S.Ct. 2059, 138 L.Ed.2d 481 (1997); *Breard v. Pruett*, 134 F.3d 615 (4th Cir.), *cert. denied*, 521 U.S. 371 (1998); *Green v. French*, 143 F.3d 865 (4th Cir. 1998), *cert. denied*, 525 U.S. 1090 (1999).

---

[5]    *See* Respondents' Memorandum [10] at pp. 8-9.

This Court's review of Petitioner's attack on his criminal conviction is governed by the parameters set forth in the AEDPA, which amended Section 2254. As amended, Section 2254(d) provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim–
>
> > (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
> >
> > (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding. 28 U.S.C. §§ 2254(d)(1) & (2).

Thus, if the claim has been "adjudicated on the merits in State court proceedings," then the court must proceed to the first prong of the analysis under Section 2254(d). "A state court's decision is contrary to clearly established federal law under § 2254(d) where it 'applies a rule that contradicts the governing law set forth' by the United States Supreme Court or confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court] and nevertheless arrives at a result different from [that] precedent.'" *Emmett v. Kelly*, 474 F.3d 154, 160-161 (4th Cir. 2007), *quoting (Terry) Williams v. Taylor*, 529 U.S. 362, 405-06, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). "A state court's decision involves an unreasonable application of clearly established federal law 'if the state court identifies the correct governing legal rule from [the Supreme] Court's cases but unreasonably applies it to the facts of the particular state prisoner's case." *Emmett v. Kelly*, 474 F.3d at 161, *quoting Williams*, 529 U.S. at 407, 120 S.Ct. 1495. An "unreasonable application" likewise will be found if the state court "was unreasonable in refusing to extend the governing legal principle to a context in which the principle should have controlled." *Ramdass v. Angelone*, 530 U.S. 156, 166 (2000) (opinion of Kennedy, J.). Yet as *Williams* teaches, a state court's "unreasonable application" of the law informs the federal court to the extent that the latter

"may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." *Bates v. Lee*, 308 F.3d 411, 417 (4th Cir. 2002), *cert. denied,* 538 U.S. 1061 (2003), *quoting Williams*, 529 U.S. at 411. The Fourth Circuit has held that this application of federal law must be "an objectively unreasonable application of established principles to new facts." *Oken v. Corcoran*, 220 F.3d 259, 264 (4th Cir. 2000). *See also Booth-El v. Nuth*, 288 F.3d 571, 576 (4th Cir. 2002) (stressing the Supreme Court's recognition that Congress chose the word "unreasonable" in AEDPA instead of the word "erroneous" or "incorrect").

Turning to Section 2254(d)(2), the proper analysis for establishing whether there exists an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" is framed by Section 2254(e)(1), which provides that the findings of fact by a state court are entitled to a "presumption of correctness" and the petitioner must bear the burden of rebutting that presumption by "clear and convincing evidence." *See* 28 U.S.C. § 2254(e)(1). The federal courts must accord "considerable deference in their review of state *habeas* proceedings." *Lovitt v. True*, 403 F.3d 171, 178 (4th Cir. 2005), *citing (Terry) Williams v. Taylor*, 529 U.S. 362, 412-13 (2000). Thus, even if an error were identified in the record, "the habeas petitioner will be entitled to relief only if the habeas court is 'in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining the jury's verdict.'" *Jones v. Polk*, 401 F.3d 257, 265 (4th Cir. 2005), *quoting O'Neal v. McAninch*, 513 U.S. 432, 436 (1995) (internal quotation marks and citation omitted). As explained in *Jones*, "[t]he proper inquiry is not 'merely whether there was enough to support the result, apart from the phase affected by the error. It is rather, even so, whether the error itself had substantial influence. If so, or if one is left in grave doubt, the conviction cannot stand.'" *Jones*, 401 F.3d at 265, *quoting Kotteakos v. United States*, 328 U.S. 750, 765 (1946).

## D.  Petitioner's Grounds for Habeas Relief

Petitioner's Petition set forth the following grounds for relief, which are included in

their entirety below:

Petitioner's conviction and sentence for murder violate the Double Jeopardy Clause of the United States Constitution.  Mr. Baum was indicted for murder by the Pickens County Grand Jury on November 11, 1999. Petitioner's trial commenced on October 9, 2000 before the Honorable John W. Kittredge.  The state elected to call the case despite the fact that the victim's body had never been found.  The parties selected a jury, which was sworn after 12:31 p.m. on October 9, 2000.  The jury heard the testimony of three witnesses:  Edie Pinion, Steven Steward, and William Rutledge. Trial Transcript I 129 - 192.  On the morning of October 10, 2000, the prosecutor announced that remains of a body believed to be the victim had been discovered. Trial Transcript I 201.  The prosecutor submitted an affidavit from a dentist that the dental records matched those of the victim.  Trial Transcript I 202 & Court's Exhibit 2. The prosecutor moved "for either a continuance or a mistrial, in order to give both sides of this case time to look at what evidence may come forward as a result of this." Trial Transcript I 202.  The prosecutor further stated that "we are here and are prepared to go forward . . . [b]ut this is important evidence that we need to have some time to look at."  Trial Transcript I 202 - 203. Petitioner's trial counsel strenuously objected to the grant of a mistrial.  Trial Transcript 203.  Despite defense counsel's objection and the state's alternative request for a continuance, the trial judge declared a mistrial.  Trial Transcript I 203-204.

On November 2, 2000, the Honorable Henry Floyd presided over a bond hearing for petitioner.  Judge Floyd stated that he had contacted Judge Kittredge regarding the matter, and that Judge Kittredge would file an order stating his reasons for granting a mistrial.  Bond Hearing 10.  Consequently, on November 8, 2000, a month after petitioner's initial trial, and after Judge Kittredge's term of court had expired, Judge Kittredge filed an order expressing his rationale for granting the mistrial.  In that order, Judge Kittredge stated that he found "it was of manifest necessity that a mistrial be granted."  Mistrial Order 2.  Despite defense counsel's objection to a mistrial, the judge stated that "[t]he potential for exculpatory evidence being located with the body and the disposition site is significant and could potentially benefit or even exonerate the defendant."  Mistrial Order 2-3.  Ignoring the state's alternative continuance proposal, Judge Kittredge went on to find that "there was no other alternative available to the court to resolve this matter."  Mistrial Order 3.  The judge's only discussion of alternative resolutions was one sentence:  "Furthermore, to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned (especially Defendant and the jurors) and contrary to the ends of justice."  Mistrial Order 3.

On January 22, 2001, a second trial commenced in Pickens County before Judge Floyd.  Despite Judge Floyd's opinion that the court would "spend two or three days here doing something that's not, you know, not going anywhere," and the defendant's motion to bar retrial due to double jeopardy, Judge Floyd held that Judge Kittredge's Order required that he proceed with the trial.  Trial Transcript II 62.  Thus, Mr. Baum proceeded to trial for the second time January 22, 2001.  He was found guilty on January 24, 2001.

On direct appeal, the South Carolina Court of Appeals concluded that it could not "say that the body of the victim in this case was critical evidence in the prosecution of Baum

such that its unavailability triggers the strict scrutiny announced in *Arizona* [*v. Washington*, 434 U.S. 497 (1978)]." *South Carolina v. Baum*, 584 S.E.2d 419, 422 (S.C. Ct. App. 2003). The court further held that "the discovery of the body of a victim during a murder trial, is an extremely important piece of evidence which has just as much potential to exonerate as to inculpate an accused." *Id.* On these bases, the state court affirmed Mr. Baum's conviction.

The Double Jeopardy Clause, contained in the Fifth Amendment to the United States Constitution, provides that a criminal defendant may not be placed twice in jeopardy. In *Benton v. Maryland*, 395 U.S. 784 (1969), the Supreme Court held that the Double Jeopardy Clause applies to the states through the Fourteenth Amendment. When determining whether a defendant's right to be free from double jeopardy has been transgressed, the first consideration is whether jeopardy has attached. In *United States v. Jorn*, 400 U.S. 470 (1971), the Supreme Court held that jeopardy attaches when a defendant is put to trial before the trier of facts. Thus, jeopardy clearly had attached in the instant case because the jury had been sworn, and in fact, three witnesses had testified.

The second consideration is what circumstances preclude retrial when the initial trial is aborted prior to verdict and over the defendant's objection. According to the Supreme Court, a retrial is permitted under these circumstances only when the mistrial is granted due to manifest necessity. *Jorn*, 400 U.S. at 481. As Justice Story expressed in the seminal case, *United States v. Perez*, 9 Wheat. 579, 580 (1824), courts have the authority to grant mistrials over the defendant's objection when "taking all the circumstances into consideration, there is a manifest necessity for the act." Justice Story explained that the "power ought to be used with the greatest caution, under urgent circumstances, and for very plain and obvious causes." *Id.* Thus, the critical question is what constitutes "manifest necessity." In *Arizona v. Washington*, 434 U.S. 497 (1978), the Court discussed a spectrum of circumstances for determining the existence (or lack of) manifest necessity. "At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence." *Id.* at 507. In such situations, the "strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is a reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508. Meeting this standard will be difficult, if not impossible, for any prosecutor. *Id.* at 508. At the other end of the spectrum - where manifest necessity can more easily be demonstrated - is when a mistrial is granted due to a deadlocked jury. *Id.* at 509.

The Court has made clear that determining whether manifest necessity exists requires a court to consider the facts and circumstances of each case. *Washington*, 434 U.S. at 506. The primary consideration is whether there are alternatives to a mistrial. *Jorn*, 400 U.S. at 487. Another consideration is whether the trial court gave the defendant an opportunity to explain his or her position on a mistrial. *Washington*, 434 U.S. at 515-516. Finally, a court must consider whether granting a mistrial denied the defendant the right to "retain primary control of the course to be followed" at trial. *United States v. Dinitz*, 424 U.S. 600, 609 (1976).

In *Downum v. United States*, 372 U.S. 734 (1963), the United States Supreme Court held that the Double Jeopardy Clause was violated where a trial judge granted a mistrial and found manifest necessity when a prosecution witness did not show up to testify. The Court held that "[t]he situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict." *Downum*, 372 U.S. at 737 (internal citations omitted). Essentially, "when the

[prosecutor] impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance." *Id.*

In the instant case, the trial judge's grant of a mistrial based upon a finding of manifest necessity was constitutional error. The judge granted a mistrial over the defendant's objection to allow the prosecution to review and secure additional evidence. The prohibition of a retrial prevents the prosecutor from "gain[ing] an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own." *United States v. DiFrancesco*, 449 U.S. 117, 128 (1980). Here, the obvious basis of the mistrial was the "unavailability of critical prosecution evidence" - the victim's body. Therefore, the court must apply the strictest scrutiny. Like the prosecutor in *Downum*, the prosecutor in this case "took a chance" when he called the case to trial without the body of the victim.

Additionally, the trial court refused to consider alternatives to granting a mistrial. When the prosecutor moved for a mistrial, he moved for "either a continuance or a mistrial." Trial Transcript I 202. In short, the state admitted that a mistrial was not necessary. Thus, a reasonable alternative - a continuance - existed, but was not embraced by the trial judge. Further, after the prosecutor moved for "either a continuance or a mistrial," the prosecutor noted that he was present and prepared to go forward. Trial Transcript I 202-203. Thus, another alternative to granting the mistrial was proceeding with the trial as the prosecutor stated he was prepared to do. These facts clearly reveal the lack of manifest necessity. (Petition [1] at pages 4-7).

The Respondent, in its Motion for Summary Judgment [11], has argued that "the South Carolina Court of Appeals correctly identified and reasonably applied United States Supreme Court precedent regarding double jeopardy to the facts of this case."[6]

The Petitioner also has moved for summary judgment [17], arguing that "the trial judge's decision to grant a mistrial was constitutional error. Over the defendant's objection, the judge granted a mistrial to allow the prosecution to review and secure additional evidence."[7] Essentially, Petitioner contends that the trial judge abused his discretion when he held that the discovery of Pinion's remains constituted "manifest necessity" and granted the solicitor's motion for a mistrial over the objections of Petitioner's counsel, subjecting him to a

---

[6]    *See* Respondent's Return and Memorandum of Law in Support of Motion for Summary Judgment [11] at p. 12.

[7]    *See* Petitioner's Motion for Summary Judgment and Memorandum of Law Opposing the State's Motion for Summary Judgment [15] at p. 19.

second criminal prosecution which violated his rights under the Double Jeopardy Clause of the United States Constitution.[8]

## V.  DISCUSSION

### A.  The Double Jeopardy Clause

In *Gilliam v. Foster*, 75 F.3d 881 (4th Cir. 1996) (en banc),[9] the Fourth Circuit stated:

> The Double Jeopardy Clause of the Fifth Amendment, made applicable to the states through the Fourteenth Amendment, provides that no one shall "be subject for the same offence to be twice put in jeopardy of life or limb." U.S. Const. amend. V; *Benton v. Maryland*, 395 U.S. 784, 794, 89 S.Ct. 2056, 2062, 23 L.Ed.2d 707 (1969).  Among the protections provided by this Clause is the assurance that a criminal defendant will not be subjected to "repeated prosecutions for the same offense."  *Oregon v. Kennedy*, 456 U.S. 667, 671, 102 S.Ct. 2083, 2087, 72 L.Ed.2d 416 (1982).  This protection encompasses a right to have a particular tribunal decide guilt or innocence once jeopardy has attached.  *Id.* at 672-73, 102 S.Ct. at 2087-88.

In the instant case, jeopardy clearly had attached because the jury had been sworn, and in fact, three witnesses had testified.[10]  *See, e.g.*, *Gilliam*, 75 F.3d at 893 ("It is well settled that jeopardy attaches in a jury trial when the jury is empaneled and sworn."), *citing Crist v. Bretz*, 437 U.S. 28, 35, 98 S.Ct. 2156, 2160-61, 57 L.Ed.2d 24 (1978).  However, the right to have a particular tribunal decide guilt or innocence once jeopardy has attached is not absolute. *Sanders v. Easley*, 230 F.3d 679, 685 (4th Cir. 2000).  There are circumstances under which retrial is permitted after a criminal proceeding has ended in mistrial.  For example, if a defendant requests or consents to a mistrial, the Double Jeopardy Clause will not bar retrial unless the prosecutor has engaged in conduct intended to provoke the mistrial request.  *Id*, *citing Oregon v. Kenney*, 456 U.S. 667, 675-76, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982).  If

---

[8]    *See* Petition [1] at p. 2., (f) and (g)(6).

[9]    The Fourth Circuit's majority opinion was written by Judge Wilkins, in which chief Judge Ervin and Judges Hall, Murnaghan, Hamilton, Williams, Michael, and Motz joined.  Judge Wilkinson wrote a dissenting opinion in which Judges Russell, Widener, Niemeyer, and Luttig joined; Judge Niemeyer wrote a dissenting opinion in which Judge Widener joined; and Judge Luttig wrote a dissenting opinion in which Judges Russell, Widener, Wilkinson, and Niemeyer joined.

[10]    *See* Tab #1, pp. 112 - 192.

the defendant opposes the declaration of a mistrial, however, retrial is prohibited unless there was a manifest necessity for the mistrial or the failure to declare a mistrial would have defeated the ends of justice. *See Wade v. Hunter*, 336 U.S. 684, 690, 69 S.Ct. 834, 93 L.Ed. 974 (1949).

## B.  The Granting of a Mistrial

In the present case, the Petitioner argues that the trial judge abused his discretion in finding that manifest necessity existed to grant a mistrial.  In analyzing Petitioner's argument, the court is aware that great deference is to be accorded the decision of the trial judge to grant a mistrial. *Gilliam*, 75 F.3d at 894, *citing Illinois v. Somerville*, 410 U.S. 458, 461-66, 93 S.Ct. 1066, 1067-17, 35 L.Ed.2d 425 (1973).  Nevertheless, a reviewing court is obligated to determine whether the trial judge exercised "sound discretion" in declaring a mistrial. *Gilliam*, 75 F.3d at 894, *citing Arizona v. Washington*, 434 U.S. 497, 514, 98 S.Ct. 824, 835, 54 L.Ed.2d 717 (1978).  "First, a reviewing court should look to whether a trial judge rationally could conclude that the grant of the mistrial was compelled by manifest necessity or whether the ends of public justice demanded that one be granted on the peculiar facts presented." *Gilliam*, 75 F.3d at 894 (citations omitted).  "[T]he key word 'necessity' cannot be interpreted literally; instead, contrary to the teaching of Webster, we assume that there are degrees of necessity and we require a 'high degree' before concluding that a mistrial is appropriate." *Arizona v. Washington*, 434 U.S. 497, 506, 98 S.Ct. 824, __ L.Ed.2d ___(1978).      As the majority of the *Gilliam* court explained:

> Whether a grant of a mistrial is manifestly necessary is a question that turns on the facts presented to the trial court.  *Somerville*, 410 U.S. at 464, 93 S.Ct. at 1070; *Wade*, 336 U.S. at 690-91, 69 S.Ct. at 837-38.  It is not a mechanically applied standard, but rather is a determination that must be made in the context of the specific difficulty facing the trial judge. *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 831; *see Somerville*, 410 U.S. at 467, 93 S.Ct. at 1072 (rejecting application of rigid rules in which categories of errors support or fail to support manifest necessity for the grant of a mistrial).  And, while manifest necessity for a mistrial does not require that a mistrial be "necessary" in the strictest sense of the word, it does require a high degree of necessity.  *Arizona v. Washington*, 434 U.S. at 506, 98 S.Ct. at 831. Perhaps the clearest example of a situation in which manifest necessity exists for a mistrial is

> when a jury is unable to reach a verdict. *Id.* at 509, 98 S.Ct. at 832. At the other extreme are situations in which a prosecuting attorney seeks a mistrial in order to have additional time to marshal evidence to strengthen the case against the defendant. *Id.* at 508, 98 S.Ct. at 831-32. Between these two extremes exists a spectrum of trial errors and other difficulties, some creating manifest necessity for a mistrial and others falling far short of justifying a mistrial. *See id.* at 510, 98 S.Ct. at 832-33.

As *Gilliam* teaches, then, the determination of "manifest necessity" must be made in light of the particular facts and circumstances of each case. Petitioner argues that the trial court erred in finding that the discovery of Pinion's body after the start of trial constituted "manifest necessity" for granting the Solicitor's motion for a mistrial, because the government requested a mistrial for the purpose of gaining a tactical advantage in a future retrial. Such alleged malfeasance by the government would necessarily trigger this court's review of the case under the strict scrutiny standard articulated in *Arizona v. Washington*, 434 U.S. 497, 508, 98 S.Ct. 824, 54 L.Ed.2d 717 (1978). In support of this court's application of the strict scrutiny standard, the Petitioner argues:

> In the instant case, the trial judge's grant of a mistrial based upon a finding of manifest necessity was constitutional error. The judge granted a mistrial over the defendant's objection to allow the prosecution to review and secure additional evidence. The prohibition of a retrial prevents the prosecutor from "gain[ing] an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own." *United States v. DiFrancesco*, 449 U.S. 117, 128 (1980). Here, the obvious basis of the mistrial was the "unavailability of critical prosecution evidence" - the victim's body. Therefore, the court must apply the strictest scrutiny.

In *Arizona v. Washington*, the Supreme Court held that "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, (footnote omitted) or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused. (Footnote omitted)." In explaining the reference to the "unavailability of critical prosecution evidence," however, the court made clear that it referred to circumstances where a prosecutor had chosen to proceed to trial, aware that key witnesses are not available to give testimony, and later moved for, and obtained a mistrial for that reason. In such a case, a second

prosecution is barred. *Arizona*, 434 U.S. at 508, 98 S.Ct. At 832, *citing Downum v. United States*, 372 U.S. 734, 83 S.Ct. 1033, 10 L.Ed.2d 100.

Petitioner argues that in applying the "strictest scrutiny to the instant facts," as this Court is required to do, it is clear that manifest necessity did not exist. The Petitioner argues that the state's case against Petitioner was entirely circumstantial and the prosecution had no eye witnesses and no confession. The only physical evidence the state had connecting the defendant to the crime scene was a shoe impression. (Tab #1, pp. 297-307). In short, as Petitioner's argument goes, a mistrial order and finding of manifest necessity allowed the state a second opportunity to bolster its case against Petitioner, and that "that State sought to simply marshal evidence to strengthen its case against him."[11]

In the present case, the undersigned does not agree with the Petitioner that the "strictest scrutiny" must be applied in this case, because neither side knew that the body would be found after the trial had begun, and there is no allegation that the unavailability of the body until October 10 was the fault of the prosecution. As Judge Kittredge noted:

> I hereby find that the discovery of the victim's body almost one year after the date of the alleged murder was in no way a result of any act, omission, negligence, bad faith, or lack of effort on the part of the State. The State has diligently attempted to locate the deceased but had simply been unable to do so.

The trial judge issued a written order on November 8, 2000. (R. pp. 8-11). The following passage from the Order Granting Mistrial is especially instructive of the trial judge's reasoning:

> Based upon everything presented to this court, I hereby find that the discovery of the victim's body almost one year after the date of the alleged murder was in no way a result of any act, omission, negligence, bad faith, or lack of effort on the part of the State. The State has diligently attempted to locate the deceased but had simply been unable to do so. In this regard, it is reasonable to conclude that whomever placed the body of Randall Pinion in the remote area of McDowell County did so to secrete the whereabouts of the deceased and avoid detection. Furthermore, given the fact that the defendant was incarcerated since November 7,

---

[11]    Petitioner's Motion for Summary Judgment [15] at p. 5.

1999, unable to make bond, it was imperative upon the State to proceed to trial without further delay.  In fact, there was an order requiring the case to proceed to trial.

I specifically find that it is of manifest necessity that a mistrial be granted in this case. The potential for exculpatory evidence being located with the body and the disposition site is significant and could potentially benefit or even exonerate the defendant.  This Court is aware of the concerns regarding a mistrial in any case and makes the decision after careful review of all the circumstances and the possible alternatives to granting a mistrial.

The Court of Appeals noted that "the strictest of scrutiny is appropriate when the basis for a mistrial is the unavailability of critical prosecution evidence," but disagreed that the general proposition was applicable to the specifics of the *Baum* case, reasoning:

First, we cannot say the body of the victim in this case was **critical** evidence in the prosecution of Baum such that its unavailability triggers the strict scrutiny announced in *Arizona*.  As noted by Baum, the fact that Randall Pinion had been murdered was not in issue.  At any rate, we conclude the discovery of the body of a victim during a murder trial, is an extremely important piece of evidence which has just as much potential to exonerate as to inculpate an accused. The judge recognized as much, and found that the public's interest in a fair adjudication was implicated by the possibility of discovery exculpatory evidence and giving the jury the benefit of the fully developed facts when deciding the matter.  Consequently, we believe manifest necessity was clearly established, and find no abuse of discretion in the trial judge's determination that a mistrial was dictated by such.  *Baum*, — at —.

Thus, the Court of Appeals held that Pinion's body was *not* "critical evidence in the prosecution of Baum such that its unavailability triggers the strict scrutiny announced in *Arizona*."  Indeed, it can be said that the evidence was equally unavailable to the parties prior to the start of trial; likewise, the parties were equally without knowledge of what evidence the body contained at the time it was discovered.  At the time the body was found, the evidence had the potential to affect both parties equally.  It follows, then, that the application of the "strictest scrutiny" is not appropriate, because there was no indication whatsoever that the discovery of the body after the trial began was the fault of the prosecution.

Next, the court disagrees with the Petitioner's claim that the trial judge granted the mistrial solely "to allow the prosecution to review and secure additional evidence."  This argument rings hollow, as it certainly can be said that the defense was equally allowed to

review and secure additional evidence after the body was discovered.  Indeed, both the trial

judge and the solicitor noted the possibility of exculpatory evidence in discussing the grant of

the mistrial.  (Tab #1, p. 5, lines 11-14–p. 6, lines 21-25).  After the victim's body was found,

the prosecution stated:

> Your Honor, based on finding the body, at this time, I feel that I have to move for either a
> continuance or a mistrial in order to give both sides of this case time to look at what evidence
> may come forward as a result of this.  Obviously, there may be - - we don't know what's going
> to show up, but there may be evidence exculpating the defendant.  And if that's true, he needs
> to have access to that.  Conversely, there may be evidence that inculpates him and shows that
> he, in fact, is the one who dumped the body.  (Tab #1, p. 202).

The prosecutor continued, saying: "

> Your Honor knows that we are here and are prepared to go forward, and it's not any attempt
> whatsoever to continue this trial.  As a matter of fact, I believe myself and the family who are
> here behind me are as ready as the Defendant himself to get this behind us.  But this is
> important evidence that we need to have some time to look at.  (Tab #1, pp. 5-6).

Specifically, the trial judge stated that he found "this is a matter of manifest necessity

that potentially could enure to the benefit of the defendant."  The solicitor noted, and the

judge considered, that an array of new evidence (either inculpatory or exculpatory) may be

uncovered with sufficient time to examine the body and site where the body was discovered:

> Obviously, there may be evidence exculpating the defendant.  And it
> that's true, he need to have access to that.   Conversely, there may be
> evidence that inculpates him and shows that he, in fact, is the one
> who dumped the body.  And if that's the case, he should not be
> allowed to benefit from his attempt at obstructing justice.  (Tab #1, p.
> 5, lines 11-17).

Judge Kittredge went on to state that "[a] key issue in the case was the fact that the body had

not been found.  This revelation is significant.  And if it actually turns out, based on scientific

examination, that this is indeed the remains of [the victim], then this case should well not

continue and be retried at another date."  (Tab 1, p. 7).  Thus, the trial judge believed it was

possible for either side to benefit from whatever evidence that would come from the body.

The Petitioner argues before this court that while the trial judge also stated in his Order that

he granted the mistrial because Baum might benefit from the possible discovery of

exculpatory evidence possibly located with the body, Petitioner contends that the court should discount that remark for two reasons. First, Petitioner's trial counsel clearly stated desired to go forward. The decision to waive access to any exculpatory evidence is one for the defendant to make. The trial judge did not engage in any colloquy with the defendant to determine whether he understood the possibility of discovering exculpatory evidence and whether he would waive any subsequent to challenge to the use of such possible evidence if the trial proceeded. This court's review of the transcript, however, indicates that trial judge invited a colloquy with Petitioner's attorney, and said, "Mr. Dejong, I'll be glad to hear from you, sir." (Tab #1, p. 6). Mr. Dejong merely stated:

> May it please the court, your honor. Just for the record, that is certainly the state's motion. The defense is not joining in that motion in any way, shape, form, or fashion. We are here. We're ready for trial. And we're ready to proceed, your honor. (Tab #1, p. 6).

Petitioner's attorney did not argue anything further–that is, as Petitioner now argues to this court, whether he understood the possibility of discovering exculpatory evidence and whether he would waive any subsequent to challenge to the use of such possible evidence if the trial proceeded. Simply stated, Petitioner's attorney did not present further argument, even though the court gave him an opportunity to state his opinion regarding the Solicitor's motion for a continuance or a mistrial.

Petitioner also argues that this court should discount the motives articulated by the trial judge in granting a mistrial, noting that the Fourth Circuit, relying on *Jorn*, 400 U.S. at 483, 91 S.Ct. at 556, has recognized, "a trial judge's beneficent motive . . . [is] accorded little or no weight." *Whitfield v. Warden*, 486 F.2d 1118, 1123 (4th Cir. 1973). Petitioner encourages this court to ignore the trial court's statement that granting a mistrial would also allow the defendant to benefit from any possible exculpatory evidence. The court will decline the invitation to question the state court's motives. As Judge Floyd, sitting on the State bench, observed: "The trial judge in his order articulated reasons as to why there was manifest necessity and –whereas in *Gilliam v. Foster*, that was not done." (Tab #1, p. 35).

Next, the Petitioner claims in his Petition that "the obvious basis of the mistrial was the 'unavailability of critical prosecution evidence' – the victim's body."[12]  As a threshold matter, however, Petitioner has not been consistent in his argument regarding whether or not Pinion's body was "critical prosecution evidence".  For example, Petitioner conceded in State court that"the fact that Randall Pinion had been murdered was not in issue" (App. p. 6; Final Brief of Appellant, p. 9), and likewise conceded in State court that there was no significant evidence from the body at all (Final Brief of Appellant, p. 6 and 8).  However, in apparent contradiction to his argument before State court, the Petitioner argues to this court that "the obvious basis of the mistrial was the 'unavailability of critical prosecution evidence' – the victim's body."[13]  The Petitioner, however, fails to explain to this court the reason he now considers Pinion's body to be "critical prosecution evidence[.]"  To begin with, Petitioner may not now argue that the State's case was strengthened by additional evidence, or that the body was critical evidence as to the fact of murder (Response and Motion, p. 21), when he previously conceded in State court that "the fact that Randall Pinion had been murdered was not in issue" and that there was no significant evidence from the body at all.  *See, e.g., E.F. Operating Corp. v. American Bldgs*, 993 F.2d 1046, 1050 (3rd Cir. 1993)( "It goes without saying that one cannot casually cast aside representations, oral or written, in the course of litigation simply because it is convenient to do so, and under the circumstances here, a reviewing court may properly consider the representations made in the appellate brief to be binding as a form of judicial estoppel, and decline to address a new legal argument based on a later repudiation of those representations.").

In addition, the solicitor never argued that he could not continue the trial without the body–in fact, the Solicitor stated in opening remarks that the body had never been found.

---

12      *See* Petition [1] at p. 7.

13      *See* Petition [1] at p. 7.

Given these facts, it is simply not logical for Petitioner to ask this court to conclude that the mistrial was granted based on the "unavailability of critical prosecution evidence." The court notes that Petitioner's claim that the basis of the mistrial was the "unavailability of critical prosecution evidence" is further undermined by the fact that the Petitioner alleged in his pending PCR action that evidence obtained from the body should have been used to his benefit.[14] To be sure, the trial judge considered the possibility that evidence from the body could be used to benefit Baum, and stated from the bench:

> I'm going to declare a mistrial. I have received an affidavit from the dentist. Based on his review of the situation and a conference with the medical examiner for the State of North Carolina, based on the level of certainty that this may, indeed, be the remains of Mr. Pinion, that a mistrial is warranted for good cause, not the result of anything caused or done, any act or omission by the state. I feel that this is a matter of manifest necessity and that jeopardy will continue. Jeopardy does not attach and begin anew in my firm judgment, and I so rule that this is a matter of manifest necessity that potentially could enure to the benefit of the defendant. (Tab #1, p. 6) (Emphasis supplied by the undersigned).

Thus, the court disagrees with Petitioner's characterization of the evidence as "critical prosecution evidence" as the evidence had the potential to be "critical" to both sides.

The undersigned finds, too, that Petitioner's reliance on *United States v. DiFrancesco*, 449 U.S. 117, 128 (1980) is inapposite to the facts at hand. Petitioner relies upon the general rule that the prohibition of a retrial prevents the prosecutor from "gain[ing] an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own." Although the court certainly agrees with the general propositions set out in *DiFrancesco*, the court is of the opinion that Petitioner overstates his case in relying on that principle. In the present case, after the jury was sworn, the jury panel heard testimony from three of the State's witnesses. The next day, the prosecutor moved for a mistrial or for a continuance on the grounds that Pinion's body had been identified through dental records. Given these facts, the undersigned is not persuaded that in the course of the testimony from

---

[14]     *See* Baum's Brief in Support of PCR Application (Tab #14) at p. 8, Issue Four; *see also supra* at p. 8 (listing grounds for PCR relief).

three (3) of the State's witnesses (and cross-examination by the defense), the State was able to unfairly "gain an advantage from what it learn[ed] at the first trial about the strengths of the defense case and the weaknesses of its own."

Cases such as *Downum v. United States*, 372 U.S. 734 (1963), likewise do not support the Petitioner's position. In *Downum*, the United States Supreme Court held that the Double Jeopardy Clause was violated where a trial judge granted a mistrial and found manifest necessity after a prosecution witness did not appear to testify. The Court held that "[t]he situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict. . . . There is no difference in principle between a discovery by the district attorney immediately after the jury was impaneled that his evidence was insufficient and a discovery after he had called some or all of his witnesses." *Downum*, 372 U.S. at 737-38 (internal citations omitted). Essentially, "when the [prosecutor] impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance." *Id.* Petitioner claims in his Petition[15] that the Solicitor, like the prosecutor in *Downum*, "took a chance" when he called the case to trial when Pinion's body had not yet been found. It is significant, however, that in *Downum*, the prosecutor did not discover until after the jury had been impaneled that a necessary witness would not appear to testify. In contrast, in the present case, the solicitor started his case knowing that Pinion's body had not been found, and was ready to proceed to trial without that evidence, as the solicitor indicated after the body had been found. The solicitor states: "Your honor knows that we are hear and are prepared to go forward, and it's not any attempt whatsoever to continue this trial. As a matter of fact, I believe myself and the family who are here behind me are as ready as the defendant himself to get this behind us."[16]

---

[15]     *See* Petition [1] at p. 7.

[16]     *See* Tab #1, at p. 6.

From the trial court's perspective, having just been informed of the discovery of Pinion's body, it cannot be said that the prosecution could be the only party who could benefit from evidence discovered in connection with Pinion's body. As the trial judge observed, the body could possibly produce exculpatory evidence. (R. pp. 9-10). Moreover, the trial judge confirmed in his written order that a significant amount of delay was anticipated before the parties would receive information from the discovery. *See, e.g., State v. Carter*, 890 S.W.2d 449, 453-54 (Tenn.Ct.Crim.App. 1994) (mistrial did not bar retrial in case where, among other delays, testing of weapon believed to be murder weapon, including probable additional testing by defense, created unacceptable delay). The fact that yet untested evidence could be beneficial to either party was discussed at the trial level is a factor for this court to consider in concluding that manifest necessity existed to grant a mistrial.

As explained in *Gilliam*, "a reviewing court may find relevant whether the trial judge acted precipitately or whether the trial judge expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial." *Gilliam*, 75 F.3d at 895, *citing Arizona v. Washington*, 434 U.S. at 514-16, 98 S.Ct. at 834-35, *and United States v. Jorn*, 400 U.S. 470, 486-87, 91 S.Ct. 547, 557-58, 27 L.Ed.2d 543 (1971) (Harlan, J.) (plurality opinion).

The record supports the court's conclusion that the trial judge in this case properly exercised his discretion. The trial judge was faced with the fact that the victim's body was located after only one day of trial. No testing had been done at that point. If there was evidence tending to exonerate Petitioner, Petitioner was certainly entitled to an opportunity to use same in his defense. Indeed, fairness dictated such evidence be presented, and, as noted above, Petitioner has subsequently complained, in his state PCR action, that evidence gathered from the victim's remains *should* have been used in his defense. Moreover, the trial judge specifically noted and considered the constitutional concerns in granting a mistrial, and,

contrary to Petitioner's assertion in this action, (Habeas Petition, p. 7), he considered the

alternate courses of action available:

> The Court is aware of the decision in *Gilliam v. Foster*, 75 F.3d 881, and specifically finds that there was no other alternative available to the court to resolve this matter.  It is imperative that the jury charged with deciding this case be given any and all relevant evidence upon which to base their decision.  *See also Foster v. Gilliam*, 515 U.S. 1301 (1995).  To ignore the opportunity to explore the disposition of the body, which could very likely be exculpatory to the defense, is too great.  As stated in *State v. Prince*, 279 S.C. 30, 301 S.E.2d 471 (1983), the standard for declaring a mistrial depends upon the existence of "manifest necessity or the ends of public justice, the latter being defined as the public's interest in a fair trial designated to end in just judgment."  *Id.*, at 472.  *See also Illinois v. Somerville*, 410 U.S. 458 (1973); *State v. Gamble*, 275 S.C. 492; 272 S.E.2d 796 (1980); *and State v. Kirby*, 269 S.C. 25, 236 S.E.2d 33 (1977).  Furthermore, to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned (especially Defendant and the jurors) and contrary to the ends of justice.

> Having found the existence of manifest necessity for the mistrial, jeopardy continued in this case and the State is not prohibited from retrying the case at a later time.  (Tab #1, p. 10).

Petitioner relies on *Jorn* to argue that one of the "primary considerations" that must be

taken into account by the trial court is whether there are alternatives to a mistrial[17] and that

"manifest necessity can only exist if less drastic alternatives are unavailable."[18]  The

Petitioner suggests that the trial judge's one-sentence discussion of alternative resolutions was

not sufficient, and that the trial judge should have considered alternatives other than to

"suspend the trial of the case and allow the sitting jury to resume the trial approximately two

months later would be fundamentally unfair to all concerned (especially Defendant and the

jurors)[.]"[19]  The court notes that "manifest necessity" is a contextually dependant and

consequently can be found under a spectrum of circumstances.  *See, e.g., United States v.*

*Bauman*, 887 F.2d 546, 550 (5th Cir. 1989)("The availability of alternatives less draconian

---

[17]    *See* Petitioner's Motion for Summary Judgment and Memorandum of Law Opposing the State's Motion for Summary Judgment [15] at p. 19.

[18]    *See* Petitioner's Motion for Summary Judgment and Memorandum of Law Opposing the State's Motion for Summary Judgment [15] at p. 19, *citing Jorn*, 400 U.S. at 487.

[19]    *See* Petitioner's Motion for Summary Judgment and Memorandum of Law Opposing the State's Motion for Summary Judgment [15] at p. 22-24.

than a mistrial does not necessarily preclude reprosecution, as reasonable judges may differ concerning proper curative measures"). This is not to say that consideration of the options may be avoided but only that the judge retains, indeed must properly exercise, his discretion in the matter. The presence of valid alternatives may very well impact the discretionary ruling. However, alternatives are not simply other avenues that could be available. The real alternatives referenced in the cases citing same refer to "viable" alternatives. *See Walck v. Edmondson*, 472 F.3d 1227, 1240 (10th Cir. 2007)(manifest necessity not shown where "judge did not sufficiently consider the *viable and reasonable* alternatives to a mistrial.")(emphasis added); *Long v. Humphrey*, 184 F.3d 758 (8th Cir. 1999)(manifest necessity not shown where several "viable alternatives" would have cured prejudice). In this case, "viable" alternatives were difficult to find as the exact evidence in question was unknown and would need to be tested, analyzed or studied which would involve a significant amount of time.

Petitioner appears to allege that the trial judge must take any other course of action over the granting of a mistrial, whether viable or sufficient, when the defendant objects to the mistrial. (Response and Motion, p. 19). No Supreme Court authority requires such an ironclad restriction. To the contrary, the Supreme Court has consistently found that such determinations are fact driven and do not lend themselves to strict rules: "This formulation, consistently adhered to by this Court in subsequent decisions, abjures the application of any mechanical formula by which to judge the propriety of declaring a mistrial in the varying and often unique situations arising during the course of a criminal trial. The broad discretion reserved to the trial judge in such circumstances has been consistently reiterated in decisions of this Court." *Illinois v. Somerville*, 410 U.S. 458, 462 (1973). *See also Arizona v. Washington*, 434 U.S. 497, 505 (1978)("Because of the variety of circumstances that may make it necessary to discharge a jury before a trial is concluded, and because those circumstances do not invariably create unfairness to the accused, his valued right to have the trial concluded by a particular tribunal is sometimes subordinate to the public interest in

affording the prosecutor one full and fair opportunity to present his evidence to an impartial jury."); *United States v. Jorn*, 400 U.S. 470, 485 (1971)("The conscious refusal of this Court to channel the exercise of that discretion according to rules based on categories of circumstances reflects the elusive nature of the problem presented by judicial action foreclosing the defendant from going to his jury")(internal citations omitted).  The decision to grant a mistrial remains in the discretion of the trial judge.  *Id.*

      Further, Petitioner's position gives no deference at all to the judge's discretion, suggesting that if any subsequent counsel can envision and proffer any other option besides mistrial when a defendant object to the mistrial, (see Response and Motion, p. 24, (counsel proffers "[a] third available alternative not explored on the record"), then the trial judge has automatically failed to fully and fairly exercise discretion and consider all possible "available" alternatives.  One need look no further than the very Supreme Court precedent both parties cite to reject that contention.  In *Arizona v. Washington*, the Court noted other avenues may have been available in that case, and may have even been accepted by other judges, such that "[i]n a strict, literal sense, the mistrial was not 'necessary.'"  434 U.S. at 511.  That, of course, did not preclude the ultimate decision that retrial was permissible in that particular instance.  For instance, in *Jorn*, the mistrial was granted over whether witnesses were properly advised of their Fifth Amendment rights - - a matter that could, by various procedures - - have been addressed without a mistrial.  400 U.S. at 486-87.  In the Fourth Circuit, several cases have shown that if viable alternatives are readily available,  mistrial is not necessary. *See United States  v. Shafer*,  987 F.2d 1054, 1058 (4th Cir. 1993)(undisclosed financial documents could have been reviewed and witness recalled to avoid mistrial); *Harris v. Young*, 607 F.2d 1081, 1086 (4th Cir. 1979)("The discovery rule allows for a continuance for disclosure and inspection if new matter surfaces upon trial. This was an obvious solution to the problem.").  The fact that, in this case, it was unknown what evidence the discovery of the body would yield is an enormous distinction.  Again, though discovery of the body was

not critical or indispensable, it is logically important.  (See Appendix, p. 6)(Document 10, Attachment 7(South Carolina Court of Appeals opinion)).

It appears to the court that the trial judge did not summarily grant a mistrial, but granted it after proper consideration of constitutional concerns, the public's interest in a fair trial, the alternative to the mistrial, and the impact the alternative would have on the Petitioner and the jury.  In short, he properly exercised his discretion in determining the existence of manifest necessity.

In conclusion, the court is of the opinion that manifest necessity existed to support the grant of a mistrial over the Petitioner's objections, and that the trial court did not abuse the discretion afforded to it in so holding.

## **RECOMMENDATION**

For the foregoing reasons, it is recommended that the Respondent's Motion for Summary Judgment **[11-1] should be granted,** and that Petitioner's motion for summary judgment **[17] should be denied**.

George C. Kosko
UNITED STATES MAGISTRATE JUDGE

April 30, 2007

Charleston, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Court Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. In the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must "only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation." *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005).

Specific written objections must be filed within ten (10) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b). The time calculation of this ten-day period excludes weekends and holidays and provides for an additional three (3) days for filing by mail. Fed. R. Civ. P. 6(a) & (e). Filing by mail pursuant to Fed. R. Civ. P. 5 may be accomplished by mailing objections to:

Larry W. Propes, Clerk
United States District Court
P.O. Box 835
Charleston, South Carolina 29402

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985).