IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| UUNO MATTIAS BAUM # 272249 ) | C/A No. 9:06-2471-MBS-GCK |
| *Petitioner*, ) | |
| ) | |
| v. ) | **OBJECTIONS TO THE** |
| ) | **MAGISTRATE'S REPORT** |
| ) | **AND RECOMMENDATION** |
| COLLIE RUSHTON, Warden, ) | |
| McCormick Correctional Institution ) | |
| *Respondent*. ) | |
| _____ ) | |

## I.  INTRODUCTION.

Petitioner filed a federal habeas corpus petition pursuant to 28 U.S.C. § 2254 on September 6, 2006.  Respondent moved for summary judgment on December 15, 2006.  On January 25, 2007, petitioner filed his motion for summary judgment and memorandum of law opposing the state's motion for summary judgment.  Respondent filed its return in opposition to petitioner's motion for summary judgment on February 5, 2007.  Magistrate Kosko issued his Report and Recommendation on April 30, 2007 concluding that respondent's motion be granted and the petition denied.  Petitioner now files his objections to the Magistrate's Report and Recommendation.

## II.  OBJECTIONS TO MAGISTRATE'S REPORT AND RECOMMENDATION.

Petitioner objects to the Magistrate's report and recommendation that his petition be denied. Petitioner sets forth his specific objections below.

### A.    PETITIONER OBJECTS TO THE APPLICATION OF SECTION 2254(E) IN THIS CASE.

In his discussion of the analysis he employed for this habeas petition, the Magistrate states "[t]urning to Section 2254(d)(2), the proper analysis for establishing whether there exists an 'unreasonable determination of the facts in light of the evidence presented in the State court

1

proceeding' is framed by Section 2254(e)(1), which provides that the findings of fact by a state court are entitled to a 'presumption of correctness' and the petitioner must bear the burden of rebutting that presumption by 'clear and convincing evidence.'" (Report at 14). In addition to the Magistrate's failure to provide any support for this statement, this analysis is clear error.

The United States Supreme Court refused to answer the question whether sections 2254(d)(2) and (e)(1) function independently. *Rice v. Collins*, 546 U.S. 333, ___ (2006).[1] As a general matter, sections 2254(d)(2) and (e)(1) are each concerned with state court factual findings and their effects in federal habeas corpus proceedings. That both provisions – housed in different subsections and prescribing different standards and approaches – speak to how a federal court is required to handle state court factual determinations creates a tension on the surface. On one hand, subsection (e)(1), speaking in apparently mandatory terms, says state court factual findings "shall be presumed to be correct" absent a showing to the contrary by "clear and convincing evidence." On the other hand, subsection (d)(2) commands federal courts to assess the reasonableness of state court factual determinations "in light of the evidence presented in the State court proceeding" – that is, to look *beneath* the state court's factual *conclusions* (the same conclusions subsection (e)(1) would presume correct) to determine whether those conclusions are reasonable in light of the evidence that was before the state court.

This begs the question: How can a federal court *presume* a state court's *conclusion* to be correct (§2254(e)(1)), while simultaneously looking *beneath* that conclusion to assess the

---

[1]The question is not answered by the Fourth Circuit's opinion in *Lenz v. Washington*, 444 F.3d 295, 300-301 (4th Cir. 2006) either. In *Lenz*, the Fourth Circuit rejected the petitioner's argument that § 2254(e)(1) has *no* place in an analysis under § 2254(d)(2). *Id.* The Fourth Circuit provided very little reasoning to support its contention except a couple of citations to *Miller-El v. Dretke*, 545 U.S. 231 (2005) and *Miller-El v. Cockrell*, 537 U.S. 322 (2003) or to explain what place (e)(1) has in an analysis under (d)(2).

reasonableness of the state court's work in *reaching* that conclusion to begin with (§2254(d)(2))? As described below, the solution to this inconsistency lies not in forcing two facially incompatible (or, at best, redundant) provisions together, but in recognizing the individual roles each was designed to play in the overall scheme of habeas review. Section 2254(e) is addressed to questions that arise in the context of fact-development in federal court, and it operates to presume state court factual findings correct unless the petitioner demonstrates the ability, both procedurally (§2254(e)(2)) and substantively (§2254(e)(1)), to rebut that presumption with evidence presented for the first time in federal court. Section 2254(d), by contrast, operates to limit a federal court's ability to grant habeas relief once it has found a constitutional violation, and allows such relief only where the federal court has identified a statutorily significant problem with the state court's treatment of the petitioner's claim. Within this framework, subsection (d)(2) directs the federal court to scrutinize what the state court did *with the evidence before it*, and permits a grant of habeas relief only where the state court's erroneous denial of relief "resulted" from an objectively "unreasonable determination of the facts."

The structure and text of §§2254(d) and (e) indicate that (d)(2) and (e)(1) are mutually exclusive provisions that do not apply to the same factual matter, but instead – as their placement in different subdivisions of §2254 suggests – operate to address different situations and accomplish different tasks.[2]

Because federal habeas courts typically assess the state of the factual record early in the adjudicative process, we begin with §2254(e). On its face, §2254(e) is crafted to serve two finite and

---

[2]Perhaps because of the confusion inherent in trying to apply both §2254(d)(2) and (e)(1) to the same factual issue, the lower federal courts have said remarkably little about the relationship between these provisions during the more than ten years since AEDPA took effect. Recently, however, a handful of courts have analyzed that relationship, and although their results contain relatively minor variations, they have generally settled on approaches consistent with the argument petitioner presents here. *See generally Lambert v. Blackwell*, 387 F.3d 210, 235-237 (3rd Cir. 2004); *Taylor v. Maddox*, 366 F.3d 992, 999-1008 (9th Cir. 2004); *Breighner v. Chesney*, 301 F.Supp.2d 354, 366 (M.D.Pa. 2004).

closely related purposes:  limiting the circumstances under which habeas petitioners are permitted to present evidence to a federal court in the first instance; and defining the standard of proof that must be met when a petitioner is permitted to present evidence and seeks to use that evidence to challenge a factual determination made by a state court.  The first of these purposes was recognized by this Court in (*Michael*) *Williams v. Taylor*, 529 U.S. 420 (2000) (construing §2254(e)(2)).  The second is plain from the language of §2254(e)(1), which provides, in relevant part, that "a determination of a factual issue made by a State court shall be presumed to be correct," and "[t]he applicant shall have the burden of rebutting the presumption of correctness by clear and convincing evidence."  Read together, subdivisions (1) and (2) of §2254(e) thus have a discrete function:  to prescribe when an evidentiary hearing is permitted, what stature pre-existing state court factual findings will have at such a hearing, and what a petitioner must produce at the federal hearing in order justify the setting aside of the state court's findings.[3]

Where there is no federal evidentiary hearing – either because the petitioner cannot meet the demanding requirements of §2254(e)(2) or because the factual record that emerged from the state court is complete with regard to the claim under consideration – §2254(e) is best read as having no role to play in the federal habeas court's analysis.  Although the language of §2254(e)(1) is broad

---

[3]The history of the habeas statute further supports this reading.  In drafting AEDPA, Congress moved the presumption of correctness contained in former §2254(d) to §2254(e)(1), and placed it next to the newly drafted (e)(2).  Under the former §2254(d)(8), the requirement that the petitioner rebut the presumption of correctness by convincing evidence applied only when there had been "an evidentiary hearing in the proceeding in the Federal court."  Although this language does not appear in (e)(1), neither does language stating that the burden of rebutting the presumption by clear and convincing evidence applies in all cases regardless of whether a federal evidentiary hearing is held.  It cannot be assumed that Congress intended to repudiate this history, and (e)(1)'s placement next to the evidentiary hearing standard in (e)(2) suggests that it did not. *See Lorillard v. Pons*, 434 U.S. 575, 581 (1978) (When "Congress adopts a new law incorporating sections of a prior law, Congress normally can be presumed to have had knowledge of the . . . incorporated law, at least insofar as it affects the new statute"); Yackle, *Federal Evidentiary Hearings under the New Habeas Corpus Statute*, 6 B.U. Pub. Int. L.J. 135, 139 (1996) ("[T]he omission of the former § 2254(d)'s reference to the petitioner's burden 'in' a federal hearing is easily explained.  This new provision is considerably shorter than its predecessor and may only reaffirm prior law in a more concise way").

enough on its face to touch every instance of a federal court's consideration of a state court's factual determination such a reading is neither consistent with the canon that a "statute ought, upon the whole, to be so construed that, if it can be prevented, no clause, sentence, or word shall be superfluous, void, or insignificant," *Market Co. v. Hoffman,* 101 U.S. 112, 115 (1879) (citation omitted) (quoted in *Duncan v. Walker*, 533 U.S. 167, 174 (2001)), nor necessary to the overarching AEDPA objective of maintaining respect for state court judgments.

Section 2254(e)(1) should not and need not be read to apply beyond the scenario in which a petitioner is permitted to present new evidence in federal court for the simple reason that §2254(d)(2), by its plain language and position in the statutory scheme, is tailor-made, and better suited, to the task. Unlike §2254(e)(1) – which is situated in the same subdivision as the provision governing the availability of new fact development in federal court – §2254(d)(2) is part of AEDPA's mechanism for limiting a federal court's power to remedy a constitutional violation. *See*, *e.g.*, (*Terry*) *Williams v. Taylor*, 529 U.S. 362, 412 (2000) (§2254(d) "places a new constraint on the power of a federal habeas court to grant a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court"); *Wiggins v. Smith*, 539 U.S. 510, 534 (2003) ("The requirements for habeas relief established by 28 U.S.C. §2254(d) are thus satisfied"). As such, §2254(d)(2) is concerned not with whether evidence presented for the first time in federal court establishes a constitutional violation,[4] but with whether the state court's denial of relief on a claim the federal court has found meritorious under §2254(a) is attributable to the state court having

---

[4]As the Supreme Court recognized in *Holland v. Jackson*, 124 S.Ct. 2736, 2738 (2004) (*per curiam*), "[w]here new evidence is admitted, some Courts of Appeals have conducted *de novo* review on the theory that there is no relevant state-court determination to which one could defer." *Citing Monroe v. Angelone*, 323 F.3d 286, 297-299, and n. 19 (4th Cir. 2003); *see also Rojem v. Gibson*, 245 F.3d 1130, 1140 (10th Cir. 2001); *Williams v. Coyle*, 260 F.3d 684, 706 (6th Cir. 2001); *Cargle v. Mullin*, 317 F.3d 1196, 1206 (10th Cir. 2003).

5

unreasonably determined the facts from the evidence it had before it.

That it is best to read §2254(d)(2) as occupying the "field" where a federal habeas court adjudicates a constitutional claim using only the record that was before the state court is clear when one considers the alternative. If §2254(e)(1) were part of the equation, then the federal court would be required to apply two different standards – one a standard of proof (§2254(e)(1)'s "clear and convincing" requirement), and the other an assessment of past performance by another court (§2254(d)(2)'s "reasonableness" requirement) – to the same factual issue. This makes no sense as a practical matter, especially in view of the fact that §2254(e)(1) speaks to evidence that was not before the state courts, while §2254(d)(2) is expressly restricted to evidence that was before the state courts. Moreover, the confusion and excess work brought about by using both standards yields no appreciable benefit in the form of added protection for state court decisions. After all, as the Supreme Court explained in (*Terry*) *Williams*, "Congress specifically used the word 'unreasonable,' and not a term like 'erroneous' or 'incorrect'" in §2254(d), such that "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision [was] . . . erroneous[] or incorrect[]. Rather, that [decision] must also be unreasonable." (*Terry*) *Williams*, 529 U.S. at 411.

In light of the confusion and unnecessary doubling of analyses that would be inherent in reading both §2254(e)(1) and (d)(2) to apply to the same factual issues, and in light of the cues to be taken from each provision's placement in different parts of the statutory scheme, they should be given "independent meaning." (*Terry*) *Williams*, 529 U.S. at 404. Where a petitioner is permitted to present new evidence to a federal habeas court for the purpose of challenging an existing state court factual finding, §2254(e)(1) sets the bar the petitioner must surmount. But where the evidence

before the federal habeas court is the same as the evidence that was before the state court, and the federal habeas court has concluded that a constitutional violation has been shown, habeas relief is permitted where the petitioner can further demonstrate that the state court's failure to find error is attributable to unreasonableness in its determination of a fact material to the resolution of the claim. This approach is workable and clearly understandable, avoids the unwieldiness of applying two different inquiries to the same issue, assigns discrete but important roles each provision, and results in no derogation of AEDPA's core purposes.

B.     PETITIONER OBJECTS TO THE MAGISTRATE'S CITATION TO AND APPLICATION OF *JONES V. POLK*, 401 F.3D 257 (4TH CIR. 2005) BECAUSE DOUBLE JEOPARDY VIOLATIONS ARE NOT SUBJECT TO HARMLESS ERROR ANALYSIS.

In the Report and Recommendation, the Magistrate states that even if the federal court identifies an error in the record, the court will not grant relief unless the habeas court is "in grave doubt about whether a trial error of federal law had substantial and injurious effect or influence in determining a jury's verdict." (Report at 14)(quoting *Jones v. Polk*, 401 F.3d 257, 265 (4th Cir. 2005)). Application of this analysis to petitioner's case is clear error.

Although petitioner concedes that Supreme Court jurisprudence clearly provides that "some constitutional errors which in the setting of a particular case are so unimportant and insignificant that they may, consistent with the Federal Constitution, be deemed harmless, not requiring automatic reversal of the conviction," *Chapman v. California*, 386 U.S. 18, 22 (1967), the Court has recognized that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error" *id.* at 23. Claims for violations of the Double Jeopardy Clause due to multiple prosecutions are not subject to harmless error analysis. *Price v. Georgia*, 398 U.S. 323 (1970)(rejecting application of harmless error analysis to double jeopardy claim where petitioner

7

was subjected to a second trial for first-degree murder); *Morris v. Matthews*, 475 U.S. 237 (1986)(holding that a case alleging a violation of the Double Jeopardy Clause was not a "harmless error" case); *Brazzel v. Washington*, ___ F.3d ___, 2007 WL 1077180 (9th Cir. Apr. 12, 2007)(holding that the state court's decision was contrary to clearly established federal law where the state court held a denial of a double jeopardy claim was harmless error);Wright, et al.,*The Harmless Error Rule - Error Involving Constitutional Rights*, 3B Fed. Prac. & Proc. Crim.3d § 855 (2007) (noting that the "Court has added the rule against double jeopardy to this list of constitutional right so important that their violation requires automatic reversal"); Lissa Griffin, *Two Sides of a "Sargasso Sea": Successive Prosecution for the "Same Offence" in the United States and the United Kingdom*, 37 U. Rich. L. Rev. 471 (Jan. 2003)(recognizing that a double jeopardy violation is a structural error that is not subject to harmless error analysis); *see also Arizona v. Fulminante*, 499 U.S. 279 (1991)(explaining that harmless error analysis does not apply to structural errors).

C. **Petitioner objects to the Magistrate's rejection of the strictest scrutiny standard.**

1. The Magistrate's reading and application of *Arizona v. Washington*, 434 U.S. 497 (1978) is too narrow.

In discussing when to apply the strictest scrutiny, the Magistrate quoted *Arizona v. Washington*, 434 U.S. 497 (1978): "the strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, (footnote omitted) or when there is reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused. (Footnote omitted)." Report at 20. The Magistrate went on to say that "[i]n explaining the reference to the 'unavailability of critical prosecution evidence,' however, the court made clear that it referred to circumstances where a prosecutor had chosen to

8

proceed to trial, aware that key witnesses are not available to give testimony, and later moved for, and obtained a mistrial for that reason." Report at 20. This reading of *Arizona* is too narrow.

In *Arizona*, the Court discussed a spectrum of circumstances for determining the existence (or lack of) manifest necessity. "At one extreme are cases in which a prosecutor requests a mistrial in order to buttress weaknesses in his evidence." *Id.* at 507. The "strictest scrutiny is appropriate when the basis for the mistrial is the unavailability of critical prosecution evidence, or when there is a reason to believe that the prosecutor is using the superior resources of the State to harass or to achieve a tactical advantage over the accused." *Id.* at 508. Without question, the basic, clear wording of the Court's decision in *Arizona* in no way places the limits upon application of strict scrutiny that the Magistrate did in his Report and Recommendation.

Petitioner concedes that in *Downum*, the United States Supreme Court held that the Double Jeopardy Clause was violated where a mistrial was granted when a prosecution witness did not show up to testify. The Court held that "[t]he situation presented is simply one where the district attorney entered upon the trial of the case without sufficient evidence to convict." *Downum*, 372 U.S. at 737 (internal citations omitted). Essentially, "when the [prosecutor] impaneled the jury without first ascertaining whether or not his witnesses were present, he took a chance." *Id.* However, the Court, neither in *Downum* nor *Arizona*, limited the application of strict scrutiny in the manner limited by the Magistrate. *Downum* must be read as one example of when to apply strict scrutiny - not as the *only* time strict scrutiny applies. Certainly, the Magistrate's restricted reading of *Arizona* is unacceptable and unworkable. First, the Magistrate limited the application of strict scrutiny to the unavailability of key witnesses. The same analysis should apply for key evidence as well. A distinction between witnesses and evidence is irrational. Second, the Magistrate limited the

application of strict scrutiny to situations in which the prosecutor was unaware of the unavailability of key witnesses before the call of the case. This requirement would reward dilatory and unprepared prosecutors. Surely, the Constitution requires prosecutors to conduct a full investigation before placing a defendant in jeopardy. Obviously, the Magistrate's narrow reading of *Arizona* and the application of strict scrutiny is unacceptable.

Petitioner also objects to the Magistrate's disingenuous characterization of the victim's body as "evidence [that] had the potential to be 'critical' to both sides," Report at 26, but his unwillingness to recognize the evidence as critical prosecution evidence, particularly in light of petitioner's objection to the prosecutor's mistrial motion and implicit desire to waive any potential exculpatory evidence discovered as a result of the discovery of the victim's body. Under the specific set of facts of petitioner's case, the discovery of the victim's body and timing of the mistrial grant, the body was critical prosecution evidence. Any other characterization would completely ignore the fact that the prosecutor requested the mistrial and the fact that petitioner objected.

Similarly, petitioner objects to the Magistrate's reliance upon the trial court's finding that a "significant amount of delay was anticipated before the parties would receive information from the discovery [of the body]." Report at 28. First, the trial record is completely devoid of any discussion of how much of a delay, if any, would ensue if the trial judge granted the prosecutor's request for a continuance. The trial court's belated declaration that the trial would not resume for two months is not supported by the record. Nowhere in the transcript does the prosecutor indicate any time frame for the length of a continuance. In fact, based upon the prosecutor's desire for a continuance, a reasonable inference exists that the length of time would have been minimal. Second, the Magistrate's reliance upon *State v. Carter*, 890 S.W.2d 449 (Tenn. Ct. Crim. App. 1994) is

10

misplaced. Report at 28. The Magistrate cites *Carter* for the proposition that "[t]he fact that yet untested evidence could be beneficial to either party was discussed at the trial level is a factor for this court to consider in concluding that manifest necessity existed to grant a mistrial." Report at 28. *Carter* is easily distinguished from petitioner's case. First, *Carter* was a death penalty case and the jury was sequestered. Thus, "[a]ny long and uncertain delay could prove unreasonable, and possibly prejudicial, with a sequestered jury." *Carter*, 890 S.W.2d at 453. Second, the state and the defense failed to give the other side timely notice of witnesses. Compounding the late disclosure of the witnesses was the necessity of finding conflict-free counsel for the witnesses because at least one witness was represented by the same office representing the defendant. Obviously, counsel for the witnesses would require a considerable amount of time to investigate the witness's involvement in the capital murder and what, if any, testimony the witness could provide, particularly in light of the witness's rights against self-incrimination. *Id.* Third, the state discovered what it believed to be the murder weapon during the trial. *Id.* at 451. Thus, the *confluence* of these events, not simply the discovery of the murder weapon, resulted in manifest necessity. *Id.* Thus, the facts of *Carter* are in sharp contrast with the instant facts. However, *Carter* is instructive in that the court specifically held that the state could not use the felony murder aggravating circumstance in the event of a first-degree murder conviction. *Id.* at 454. Recognizing the sanctity of the Double Jeopardy Clause, the court held "[t]he state should not be put in any better position based upon these circumstances than was the defense." *Id*.

Furthermore, petitioner objects to the Magistrate's attempt to distinguish petitioner's case from *United States v. DiFrancesco*, 449 U.S. 117 (1980). Report at 26. The Magistrate states that the prosecutor in the instant case did not gain an advantage from what it learned through the

11

testimony of three witnesses. Report at 26-27. The Magistrate's conclusion is not supported by the record. Certainly the prosecutor gained an advantage by hearing the defense attorney's opening statement and the defense attorney's cross-examination of three witnesses because the defense revealed its strategy. One of the witnesses was petitioner's mother, whom the defense cross-examined in such a manner as to show she had a motive and the opportunity to kill her husband. Trial Transcript I 143-168, 171. Thus, the defense, particularly in his cross-examination of petitioner's mother, revealed his strategy - that another person, either petitioner's mother or the man with whom she was having an adulterous affair - was guilty of the crime.

2.    The Magistrate erred by assessing "fault" in determining whether strict scrutiny applies.

In discussing whether strict scrutiny applies, the Magistrate discussed at length whether the unavailability of the evidence was the "fault" of the prosecutor and relied upon his finding that the prosecutor was not at fault in holding that strict scrutiny does not apply to the instant case. Report at 22 ("It follows, then, that the application of the 'strictest scrutiny' is not appropriate, because there was no indication whatsoever that the discovery of the body after the trial began was the fault of the prosecution."). Additionally, the Magistrate quoted the trial court's order that "the State has diligently attempted to locate the deceased but had simply been unable to do so." Report at 21. The trial court's statement lacks any support from the record, and the Magistrate erred by adopting the statement. Whether the prosecution is at "fault" is completely irrelevant to determining whether manifest necessity exists in this case. Although the fault of the prosecutor is a relevant factor in some cases, such as when the defendant requests a mistrial when the prosecutor engages in conduct intended to provoke the mistrial request, *see Oregon v. Kennedy*, 456 U.S. 667, 675-676 (1982), fault

12

is not a relevant factor in all cases and was not even discussed in *Downum* or *Arizona*.  Therefore, the Magistrate's discussion of and reliance upon a finding, or a non-finding, of fault is improper for the discussion of whether strict scrutiny applies.

> 3.    The Magistrate's declaration that petitioner had not been consistent in his arguments regarding whether the body was critical evidence is inaccurate.

The Magistrate stated that "[p]etitioner has not been consistent in his argument regarding whether or not Pinion's body was 'critical prosecution evidence.'" Report at 25.  The Magistrate based this statement upon petitioner's statement in his brief to the state appellate court that "the fact that Randall Pinion had been murdered was not in issue."  Report at 25.  The Magistrate also relied upon a statement pulled from one of petitioner's briefs in state court that "there was no significant evidence from the body at all."  Report at 25.  Despite the Magistrate's view to the contrary, Petitioner's current position is not inconsistent with his position in state court.  First, the fact that the Pinion's death was not an issue does not mean that the recovery of his body was not critical evidence.  Quite the contrary, the body of a deceased victim is critical evidence in a murder prosecution for a variety of reasons.  The body may reveal manner, time, and/or location of death. These are all items of critical evidence in a murder prosecution.  Further, the prosecutor in this case argued that fact that the body had been found in an isolated area as evidence of malice - an essential element of murder.  Trial Transcript II at 625 ("He took this body to rural McDowell County.  It took a couple of hours to get there, down a dirt road, dropped off a 30-foot ravine, depriving Mr. Pinion's family of a just burial.")

Although in hindsight, petitioner may have remarked in his brief to the state appellate court that there was no significant evidence recovered from the body, this is not in contradiction to

13

petitioner's position that the court granted a mistrial to enable the prosecution to garner critical evidence. Throughout petitioner's pleadings in state court, he claimed that the mistrial was granted so that the prosecution could secure critical evidence. The Magistrate acknowledged in his recitation of the facts that the prosecution requested the mistrial because "this is important evidence that we need to have some time to look at." Report at 3. Therefore, the prosecutor's obvious motivation for requesting a mistrial was to provide the prosecution with an opportunity to review the new evidence to determine whether any of it inculpated the petitioner and could be used at a subsequent trial against petitioner. In short, the prosecution wanted to bolster its circumstantial case against petitioner.

Additionally, the state actually used the time granted for a mistrial to bolster its case by securing additional witnesses, including petitioner's sister. Trial Transcript II at 481 (stating that petitioner's sister Juanita Trueblood signed a statement for police on October 12, 2000, a mere two days after the trial judge granted a mistrial).

4.      Petitioner objects to the Magistrate's use of petitioner's state application for post-conviction relief as a basis for denying relief.

Repeatedly, the Magistrate references petitioner's state post-conviction relief application as a basis for rejecting petitioner's claim in the instant habeas petition. *See e.g.*, Report at 5 n.2, 26, and 28. The substance of petitioner's post-conviction relief application is not properly before this Court because it  is a pending matter[5] and petitioner is represented by different counsel.

5.      Petitioner objects to the Magistrate's reliance upon the fact that the trial judge stated he granted the mistrial because the discovery may enure to the benefit of the defendant.

_____

[5]Petitioner advised habeas counsel that his post-conviction relief application has been denied by the state trial court, but his appeal is pending.

14

The Magistrate quoted and relied upon the statement from the trial judge: "this is a matter of manifest necessity that potentially could enure to the benefit of the defendant." Report at 23. This court should discount that remark for two reasons. First, the defendant clearly indicated he desired to go forward. The decision to waive access to any exculpatory evidence is one for the defendant to make. The trial judge did not engage in any colloquy with the defendant to determine whether he understood the possibility of discovering exculpatory evidence and whether he would waive any subsequent challenge to the use of such possible evidence if the trial proceeded. The Magistrate rejects this argument by pointing to the fact that "[p]etitioner's attorney did not present further argument, even though the court gave him an opportunity to state his opinion regarding the Solicitor's motion for a continuance or a mistrial." (Report at 24). Petitioner's counsel objected to the grant of a mistrial - that is all the law requires him to do. It was unnecessary for him to present further argument. Supreme Court jurisprudence is clear that the trial judge must make a reasoned decision when deciding whether to grant a mistrial motion. *See Gilliam*, 75 F.3d at 895 ("a reviewing court may find relevant whether the trial judge acted precipitately or whether the trial judge expressed concern regarding the possible double jeopardy consequences of an erroneous declaration of a mistrial, heard extensive argument on the appropriateness of such a measure, and gave appropriate consideration to alternatives less drastic than granting a mistrial.") It is incumbent upon the trial judge, not defense counsel, to ensure that the act of granting a mistrial is not the product of precipitous action, but is the product of well-reasoned exercise of discretion. *Id.* The trial judge's failure to conduct the colloquy described by petitioner shows that the trial judge, in fact, acted precipitously. Thus, the Magistrate's statements regarding any failure by defense counsel to put forth additional arguments in objection to the prosecution's motion for a mistrial are unavailing.

15

Second, the Supreme Court has recognized that an appellate court's "post hoc assessment" as to whether a defendant would benefit from a mistrial to which he did not consent is "an exercise in pure speculation" and inappropriate for determining whether manifest necessity existed. *United States v. Jorn*, 400 U.S. 470, 483 (1971). Relying upon *Jorn*, the Fourth Circuit has recognized "a trial judge's beneficent motive . . . [is] accorded little or no weight." *Whitfield v. Warden*, 486 F.2d 1118, 1123 (4th Cir. 1973)(internal citations omitted). Thus, properly ignoring the trial court's statement that granting a mistrial would also allow the defendant to benefit from any possible exculpatory evidence, the only reason left is that a mistrial would allow the prosecution to obtain more evidence and further strengthen its case. The Magistrate flatly refused to apply Supreme Court and Fourth Circuit law: "The court will decline the invitation to question the state court's motives." Report at 24. The Magistrate's decision to cherry-pick the authority on which to rely is unfair to petitioner and contrary to the Constitution and the rule of law. Even if this court considers the trial court's remark that the discovered evidence may benefit the defendant, such a consideration, which was pure speculation[6], is not a proper basis for manifest necessity. *Jorn*, 400 U.S. at 483; *United States v. Sloan*, 36 F.3d 386, 400 (4th Cir. 1994)(stating that "speculation cannot serve as the basis for manifest necessity"). Therefore, this Court should not adopt the Magistrate's Report and Recommendation in this regard. Rather, this Court should discount the trial court's statement that the mistrial may enure to the defendant's benefit. Applying this proper legal analysis leaves the Court with the only motivation for the mistrial grant being that the prosecution wanted to secure additional evidence against petitioner.

---

[6]The fact that the state was pure speculation is obvious. The exact phrasing by the trial judge, i.e. "potentially could," clearly uses speculative language.

16

6.    <u>Reasonable application of clearly established federal law reveals that the trial judge's granting of a mistrial and finding of manifest necessity was constitutional error.</u>

In any event, the trial judge "must always temper the decision whether or not to abort the trial by considering the importance to the defendant of being able, once and for all, to conclude his confrontation with society through the verdict of a tribunal he might believe to be favorably disposed to his fate." *Jorn*, 400 U.S. at 486. In petitioner's case, the trial judge's decision to grant a mistrial was constitutional error. Over the defendant's objection, the judge granted a mistrial to allow the prosecution to review and secure additional evidence. The prohibition of a retrial prevents the prosecutor from "gain[ing] an advantage from what it learns at the first trial about the strengths of the defense case and the weaknesses of its own." *DiFrancesco*, 449 U.S. at 128. Recently, the Tenth Circuit held that manifest necessity for granting a mistrial did not exist where a prosecution witness was temporarily unavailable and the record did not show that her testimony was necessary because her sworn preliminary hearing testimony was available. Because other witnesses could have testified as to the same events and the state proceeded to trial knowing that the witness's availability was a concern, the court concluded that the trial judge's decision to grant the mistrial was constitutional error because (a) the purpose of the mistrial was to allow the state to present a stronger case, and (b) the trial judge did not consider the viable and reasonable alternatives. *Walck v. Edmondson*, ___ F.3d ___, 2007 WL 18927 at *8-10 (10th Cir. Jan. 4, 2007).

Here, the obvious basis of the mistrial was the "unavailability of critical prosecution evidence" - the victim's body. Therefore, the court must apply the strictest scrutiny. Like the prosecutors in *Downum* and *Walck*, the prosecutor in this case "took a chance" when he called the case to trial without the body of the victim. Upon finding the victim's body, the prosecution moved

17

for a continuance, or in the alternative a mistrial, so that "both sides" could examine whatever evidence the body may provide.  Trial Transcript I. 202.  The prosecutor stated that he thought he may find evidence that inculpates the defendant.  Trial Transcript I. 202.  The defendant objected to the mistrial request, indicating his desire to move forward with the proceedings with the jury chosen and with the evidence he intended to present.  Trial Transcript I. 203-204.  Applying the strictest scrutiny to the instant facts, as this Court is required to do, it is clear that manifest necessity did not exist.  The state's case against petitioner was entirely circumstantial.  The prosecution had no eye witnesses and no confession.  The only physical evidence the state had connecting the defendant to the crime scene was a shoe impression. Trial Transcript II 297-307.  In short, a mistrial order and finding of manifest necessity allowed the state a second opportunity to bolster its case against petitioner.  Thus, this case is much like the situation in *United States v. Shafer*, 987 F.2d 1054, 1058-1059 (4th Cir. 1993), where the Fourth Circuit held that manifest necessity did not exist where one of the reasons for granting a mistrial was that the prosecution's discovery violations, revealed mid-trial, had hurt the prosecution's case because some of the government witnesses, for example the financial experts, may have taken a different approach had they been provided with the withheld information.  According to the Fourth Circuit, this consideration was an improper motive for granting a mistrial based on manifest necessity.  Similarly, this Court, applying strict scrutiny, should hold that the trial court's decision to grant a mistrial and finding of manifest necessity violated petitioner's protections against double jeopardy.

**D.    THE MAGISTRATE MAKES THE SAME MISTAKE AS THE STATE COURT BY EXAMINING THIS CASE *ONLY* IN TERMS OF WHETHER STRICT SCRUTINY APPLIES.**

The Magistrate falls into the same trap as the state appellate court - only examining whether

the trial court's finding of manifest necessity was subject to scrutiny. The Supreme Court has made clear that strict scrutiny applies when the prosecuting attorney seeks a mistrial in order to have additional time to marshal evidence to strengthen the case against the defendant. *Arizona*, 434 U.S. at 508. Importantly, the Supreme Court has noted that this "extreme" case does not "mark the limit" of the double jeopardy "guarantee." *Downum v. United States*, 372 U.S. 734, 736 (1963). The Court specifically rejected the contention that double jeopardy implications only exist where the "mistrial declaration . . . unfairly aids the prosecution or harasses the defense." *Jorn*, 400 U.S. at 483 (internal citations omitted).

In other words, the Court has also made clear that such is at one extreme of the spectrum. *Arizona*, 434 U.S. at 508. The other end of the spectrum is when a jury is unable to reach a verdict - in such cases manifest necessity exists. *Id.* at 509. The Court did not stop with an explanation of the extremes. On the contrary, the Court provided instruction to lower federal courts that "[b]etween these two extremes exists a spectrum of trial errors and other difficulties, some creating manifest necessity for a mistrial and others fall far short of justifying a mistrial." *Id.* at 510. Thus, a proper analysis of determining whether manifest necessity requires an examination of the entire spectrum and a determination of whether this grant of a mistrial satisfies the "high degree" of necessity required by the Constitution in order for jeopardy to continue. *Id.* at 506. The state court, as well as the Magistrate, failed to conduct a proper examination of petitioner's case.

Even if this Court were to decide that the trial court's grant of a mistrial was not done to allow the prosecution to obtain critical evidence, this Court must still examine whether petitioner's case is within the spectrum of cases that do not create manifest necessity as required by *Arizona*. This case must fall within that spectrum. If one were to assume that the discovery of the body was

19

"extremely important" evidence[7], as the state court held, *see State v. Baum*, 355 S.C. 209, 215, 584 S.E.2d 419, 422 (Ct. App. 2003), then this case *must* fall close to the end of the spectrum in which a mistrial is granted in order for the prosecution to obtain "critical" evidence, which is not permitted. One cannot imagine a situation any closer to the extreme described by the Supreme Court than the one presented in the instant case. As such, manifest necessity did not exist.

E.     PETITIONER OBJECTS TO THE MAGISTRATE'S CONCLUSION THAT THE TRIAL JUDGE PROPERLY EXERCISED HIS DISCRETION IN CONSIDERING ALTERNATIVES.

The Magistrate erred in his analysis regarding the trial court's consideration of reasonable and viable alternatives to granting a mistrial. In short, the Magistrate stated that "'viable' alternatives were difficult to find as the exact evidence in question was unknown and would need to be tested, analyzed or studied which would involve a significant amount of time." Report at 30. Contrary to the Magistrate's statement, viable alternatives were *easy* to find as the prosecutor specifically asked for alternative relief.

The trial court's grant of a mistrial based on manifest necessity violates the Double Jeopardy Clause because viable alternatives existed. Decisions from the Supreme Court are clear on this point - manifest necessity can only exist if less drastic alternatives are unavailable. *Jorn*, 400 U.S. at 487. Additionally, case law from the Fourth Circuit supports petitioner's position. In *Gilliam v. Foster*, 75 F.3d 881, 902 (4th Cir. 1996), the Fourth Circuit held that manifest necessity did not exist where a trial judge granted a mistrial because the jurors saw photographs that had not been admitted into

---

[7]First, petitioner does not concede that the discovery of the body was not critical evidence. Second, petitioner does not concede that the terms used by the state appellate court, "extremely important" are different that the term used by the Supreme Court, "critical" to trigger strict scrutiny. However, petitioner provides this analysis as an alternative ground in the event that this Court disagrees with petitioner's argument that the evidence was critical triggering strict scrutiny. This is not an attempt by petitioner to be inconsistent in his description of the evidence, but is instead an alternative analysis for the court's consideration.

evidence.  The photographs were relevant and material, the state had laid a proper foundation for them, and they were not subject to exclusion.  *Id*. at 895-896.  According to the court, no rational argument existed that viewing the photographs improperly biased the jury.  *Id*. at 898.  Also precluding a finding of manifest necessity in *Gilliam* was the availability of an alternative - the prosecution could have recalled the witness and formally placed the documents into evidence.  *Id.* at 901-902.  In *Sanders v. Easley*, 230 F.3d 679, 687 (4th Cir. 2000), the court held that the state supreme court did not act unreasonably in affirming the trial court's grant of a mistrial on the basis of manifest necessity where the jury deliberations had become a debacle.  Evidence of the jury's devolution included a note sent to the trial judge by the foreperson that one juror had conducted outside investigations, the court's inquiry of that juror revealing she made-up the investigation because she felt harassed and ridiculed by her fellow jurors, even after further jury instructions the harassment of the juror continued, and the jury's continued consideration of extraneous matters.  *Id*.

Remarking that "[i]n determining whether the trial judge exercised sound discretion in declaring a mistrial, [the court] must consider if there were less drastic alternatives to ending the trial[ and if there were] they should have been employed in order to protect the defendant's interest in promptly ending the trial," the Fourth Circuit held manifest necessity did not exist where the prosecution did not disclose evidence in a timely manner.  *Harris v. Young*, 607 F.2d 1081, 1085 (4th Cir. 1979).  The court recounted numerous potential alternative remedies available, including admitting or excluding the evidence, granting a continuance or short recess to allow defense counsel to review the evidence, or reprimanding the offending attorney for the failure to disclose.  *Id.* at 1086.  In *United States v. Shafer*, 987 F.2d 1054, 1057 (4th Cir. 1993), the Fourth Circuit held manifest necessity did not exist where the prosecution belatedly disclosed vital exculpatory

information mid-trial.  The court stated that "the critical inquiry is whether less drastic alternatives were available."  *Id.* at 1057.   Several alternatives were available, including recalling certain witnesses so that defense counsel could cross-examine them with the new information, a brief continuance to allow defense counsel to review the materials, permitting the defendant to introduce the evidence in his case-in-chief, or the defendant's waiver of any prejudice suffered as a result of the late disclosure.  *Id.* at 1058.   In yet another Fourth Circuit case, the court held that manifest necessity did not exist.  *United States v. Sloan*, 36 F.3d 386, 389 (4th Cir. 1994).   After twenty witnesses testified for the state and nine testified for the defense, the defendant decided not to testify, despite earlier assertions that the defendant would do so.  *Id.* at 388.   The court concluded that although defense counsel had represented to the jury, and to the court, that the defendant would testify, this representation did not create manifest necessity for a mistrial because appropriate jury instructions would have provided an alternative.  *Id.*

Not only is the case law from the Supreme Court and this Circuit clear in this regard, but case law from other jurisdictions uniformly hold that manifest necessity does not exist where less drastic alternatives are available.  In a Second Circuit case, *Dunkerley v. Hogan*, 579 F.2d 141, 147 (2nd Cir. 1978), the court held that the double jeopardy barred re-trial where the trial judge, *sua sponte*, declared a mistrial based on the defendant's hospitalization the morning of the third day of trial.  The defendant objected to a mistrial, agreed to waive his presence at trial, or in the alternative to de-sequester the jury and continue the trial for the seven to ten day period that the doctors estimated he would be confined to a hospital.  *Id.*  In reaching its conclusion, the court noted that the continuance was a feasible and practical solution to the problem and that the prosecutor did not object to the continuance.  *Id.*  The Third Circuit held that to show manifest necessity, the prosecution must show

22

that "no alternative to the declaration of a mistrial" existed under the circumstances. *United States v. McKoy*, 591 F.2d 218, 222 (3rd Cir. 1979). In other words, the trial court must consider and exhaust all other possibilities. *Id.* In *Love v. Morton*, 112 F.3d 131, 137 (3rd Cir. 1997), the Third Circuit held that manifest necessity did not exist where a trial judge ordered a mistrial based upon the death of the judge's mother-in-law. The court stated that another judge, who had observed parts of the trial, could have continued with the case where there was only 122 pages of transcript and only three hours of tape recorded testimony. *Id.* The court went on to note that the trial judge made the decision to order an mistrial during "a time of distraught distraction," *id.*, and did not give counsel an opportunity to be heard or offer alternatives, *id.* at 138. Similarly, the Eighth Circuit held that manifest necessity did not exist where the trial judge failed to consult with counsel or consider alternatives. *United States v. Dixon*, 913 F.2d 1305, 1313 (8th Cir. 1990). The trial judge swore the jury late in the evening and failed to admonish the jury not to watch, read, or listen to media regarding the case. *Id.* at 1307. That evening and the next morning, the top news story concerned damaging details about the case. *Id.* After viewing a tape of the news coverage, the judge granted a mistrial without granting defense counsel an opportunity to be heard, indicating that the judge did not give adequate consideration to the defendant's constitutional protection against Double Jeopardy. *Id.* at 1313-1314. In yet another case in which the reviewing court held that manifest necessity did not exist where less drastic alternatives were available, the Tenth Circuit held that an alternative to granting a mistrial - namely granting a severance and continuing the trial of one of the co-defendants - illustrated that manifest necessity was not present. *United States v. Crotwell*, 896 F.2d 437, 441 (10th Cir. 1990). The defendant's constitutional protections against double jeopardy outweighed concerns of judicial economy, which favors presenting similar evidence against co-defendants in one

trial, where an improper remark by a prosecution witness exposed the jurors to the criminal history of one of the co-defendants. *Id.* at 439-441. The First Circuit held, in *Brady v. Samaha*, 667 F.2d 224, 229-230 (1st Cir. 1981), that a trial judge failed to exercise sound discretion in granting a mistrial where he did not consult standby counsel (the defendants proceeded pro se), acted precipitately following a rapid sequence of events culminating in a declaration of a mistrial, and failed to consider any alternatives to a mistrial, such as severance or curative instructions.

Many reasonable and less drastic alternatives to granting a mistrial were available in petitioner's case; however, the trial court, the state appellate court, and the Magistrate considered none. First, a continuance was available. In fact, the prosecutor moved for "either a continuance or a mistrial." The Magistrate quoted as such in his discussion of the facts. (Report at 2). However, no where in his discussion of whether viable alternatives existed did the Magistrate reference the prosecutor's specific request for a continuance. The only logical interpretation of the prosecutor's request is that the state admitted that a mistrial was not necessary. Thus, a reasonable and viable alternative - a continuance - existed. The record could not be any more clear that a viable alternative was available and was actually requested by the prosecution.

Furthermore, after the prosecutor moved for "either a continuance or a mistrial," the prosecutor stated that he was present and prepared to go forward. Trial Transcript I 202-203. The Magistrate acknowledged this fact in his attempt to distinguish petitioner's case from *Downum*. Record at 27 ("In contrast, in the present case, the solicitor started his case knowing that Pinion's body had not been found, and was ready to proceed to trial without that evidence, as the solicitor

24

indicated after the body had been found.").[8]  Inexplicably the Magistrate fails to acknowledge this alternative supplied by the prosecution on the record in his discussion of whether viable alternatives existed.  Therefore, based on the record another viable alternative to granting the mistrial was available -  proceeding with the trial as the prosecutor stated he was prepared to do and as the defense requested.

A third available alternative not explored on the record was permitting the state to present evidence from the dentist who supplied the court with an affidavit indicating that the dental records of the found body were substantially similar to those of the victim. Thus, the state could have established that the body of the victim had been recovered.  Because the Supreme Court's Double Jeopardy Clause jurisprudence requires consideration of the readily available alternatives and because all of these alternatives, were in fact available and viable, there was no manifest necessity. This case is very similar to *United States v. Rivera* 384 F.3d 49, 57 (3rd Cir. 2004) in which the Third Circuit noted that it must apply the strictest scrutiny where a mistrial was granted *sua sponte* due to the temporary unavailability of a prosecution witness.  In such circumstances, the court held that a trial court must "take great care to ensure that there are no available alternatives before declaring a mistrial." *Id.*  The prosecution placed itself "in a poor position . . . to argue [on appeal] that the [trial c]ourt exercised such care where the prosecution itself presented the trial court with a reasonable alternative to a mistrial, which was continuing the case until the prosecution could determine when its witness, who had become injured in another state during the course of the trial, would be able to travel." *Id.*  In other words, "one cannot casually cast aside representations, oral

---

[8]The Magistrate went on to quote the solicitor: "Your honor knows that we are hear [sic] and are prepared to go forward." Report at 27.

25

or written, the course of litigation simply because it is convenient to do so." *E.F. Operating Corp. v. American Bldgs*, 993 F.2d 1046, 1050 (3rd Cir. 1993). Thus, the state may not ignore its previous request for a continuance or its request to go forward immediately.

Finally, in the instant case, the trial judge's concerns, and the Magistrate's concerns, regarding scheduling were insufficient to support a mistrial. The United States Supreme Court has stated that scheduling considerations do not outweigh a court's duty to protect a defendant's constitutional right to be tried once, and are, by themselves, insufficient to support a mistrial. *Jorn*, 400 U.S. at 479-480. Here, the trial judge stated that "to suspend the trial of the case and allow the sitting jury to resume the trial approximately two months later would be fundamentally unfair to all concerned." Mistrial Order 3. Although the record is devoid of any evidence concerning the amount of time necessary before the trial could resume, the trial judge's consideration of scheduling issues was insufficient to support his grant of a mistrial based on manifest necessity. The Second Circuit's decision in *Mizell v. Attorney General*, 586 F.2d 942, 947 (2nd Cir. 1978) provides additional support for petitioner. In that case, the Second Circuit held that manifest necessity did not exist where prosecution witnesses were unavailable, the prosecution requested a continuance to secure the presence of the witnesses at trial, and the trial judge's reason for not granting a continuance - - the jury's convenience - - was disingenuous because the continuance would not require the jury to serve beyond the term and the jury was not sequestered. *Id.*

### F. PETITIONER OBJECTS TO THE MAGISTRATE'S CHARACTERIZATION OF STATEMENTS IN PETITIONER'S BRIEF AS A CONCESSION REGARDING THE STATE COURT'S WRITTEN ORDER.

The Report and Recommendation mischaracterized petitioner's statements regarding the state court's written order declaring a mistrial. In his motion for summary judgment, petitioner stated that

26

"on November 8, 2000, a month after petitioner's initial trial, and after Judge Kittredge's term of court had expired, Judge Kittredge filed an order expressing his rationale for granting the mistrial." (Petitioner's Motion for Summary Judgment at 14). The Magistrate misconstrued this statement as a concession that the state judge "merely reduced to writing his thoughts and ruling stated during the October 10, 2000 hearing." (Report at 4 n.2). This characterization is wrong. Petitioner has consistently taken the position that Judge Kittredge's written order was not merely an act by the judge of reducing to writing his oral order. Instead, petitioner has pointed to the judge's inclusion of facts not supported by the trial record Petitioner's Motion for Summary Judgment at 25, the undisputed suspicious circumstances surrounding the production of the written order Petitioner's Motion for Summary Judgment at 13-14 (explaining that Judge Kittredge did not write the order until Judge Floyd, who was presiding over a bond hearing at the time, called Judge Kittredge regarding the matter and the lack of a written order), and the judge's lack of authority to issue such an order Petition for writ of habeas corpus at 5 n.4; Petitioner's Motion for Summary Judgment at 14 n.6. Thus, petitioner's statement in his Motion for Summary Judgment is in no way a concession.

Additionally, the Magistrate stated that "if this court were to discount Petitioner's concession, and instead address whether this claim is properly before the court in this habeas Petition, the court would be compelled to recommend dismissal of the entire habeas action, as this claim could be considered unexhausted." Report at 5 n.2. Petitioner objects to this statement. Petitioner has not asserted this as an independent claim in his petition for a writ of habeas corpus. On the contrary, petitioner provided this information so that this court would have a complete picture of the events surrounding the claim.

27

### III.  <u>CONCLUSION.</u>

WHEREFORE, for the foregoing reasons, petitioner respectfully objects to the Magistrate's Report and Recommendation, and requests that this Court deny respondent's motion for summary judgment, and grant the writ of habeas corpus.

Respectfully submitted,

**JOHN H. BLUME #1360**
Cornell Law School
112 Myron Taylor Hall
Ithaca, N.Y. 15853
(607) 255-1030

**SUSAN B. HACKETT #9418**
Center for Capital Litigation
P.O. Box 11311
Columbia, S.C. 29211
(803) 765-1044

By: /s/ Susan B. Hackett
Counsel for Petitioner

June 1, 2007.

28